799 F.2d 895
 15 Soc.Sec.Rep.Ser. 4, Medicare&Medicaid Gu 35,812
Thomas H. KEAN, Governor of the State of New Jersey, and J.
Richard Goldstein, M.D., New Jersey State
Commissioner of Health, Appellees,
v.
Margaret HECKLER, Secretary of Health and Human Services, Appellant.
 No. 85-5663.
 United States Court of Appeals,
Third Circuit.
 Argued April 17, 1986.
Decided Aug. 28, 1986.
 
 Richard K. Willard, Asst. Atty. Gen., Thomas W. Greelish, U.S. Atty., John F. Cordes, John F. Daly (argued), Attys., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., Ronald E. Robertson, Gen. Counsel, Ann T. Hunsaker, Asst. Gen. Counsel, Thomas W. Coons, Atty., Dept. of Health and Human Services, for appellant.
 Irwin I. Kimmelman, Atty. Gen. of N.J., James J. Ciancia, Asst. Atty. Gen., Charlotte Kitler, Deputy Atty. Gen. (argued), Trenton, N.J., for appellees.
 Giordano, Halleran & Ciesla, Frank R. Ciesla, Middletown, N.J., for amicus curiae, New Jersey Hosp. Assn.
 Before SEITZ, HIGGINBOTHAM, and BECKER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Appellant, the Secretary of Health and Human Services (Secretary), appeals from an order granting summary judgment in favor of appellees. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 I.
 
 2
 This case stems from a disagreement between the State of New Jersey and the Secretary over the method by which hospitals in New Jersey will be reimbursed for services they perform on an outpatient basis under Title XVIII of the Social Security Act, 42 U.S.C. Sec. 1395 et seq. (1982) (commonly known, and hereinafter referred to as Medicare). New Jersey sought from the Secretary a "waiver" under Sec. 1886(c) of the Act, 42 U.S.C. Sec. 1395ww(c), whereby such reimbursements would be made under a plan devised by the State. The Secretary granted the State's request for a waiver with respect to inpatient services, but denied it with respect to outpatient services. In the absence of a waiver, reimbursing payments are made on the basis of the scheme set forth in the Medicare statute. Although the precise issue raised is narrow, it can be fully understood only against a fairly detailed background of the Medicare statute and its history.
 
 A. The Medicare Statute
 
 3
 The Medicare program, originally established in 1965, provides federal health insurance to the aged and disabled. The program has two components. Coverage under Part A, 42 U.S.C. Secs. 1395c to 1395i-2, is generally available automatically to all persons over the age of 64 and to the disabled. Id. Sec. 1395c. Part A principally covers inpatient hospital services, as well as related post-hospital care, home health services, and hospice care. Id. Sec. 1395d. Payments under Part A are made from the Hospital Insurance Trust Fund, which is funded by a wage tax. Id. Sec. 1395i.
 
 
 4
 Part B of Medicare is a program of "supplementary" medical insurance, also for the aged and disabled. Participation in Part B, unlike Part A, is elective. Services covered by Part B include outpatient hospital services, and others listed in 42 U.S.C. Secs. 1395k and 1395x(s). Payments under Part B are made from the Supplementary Medical Insurance Trust Fund, id. Sec. 1395t, which is funded by premiums paid by enrollees and by money appropriated by the Federal government, id. Sec. 1395j. Both Parts A and B are administered by the Health Care Financing Administration (HCFA), under authority delegated by the Secretary.
 
 
 5
 Payments under both parts of Medicare are made directly to providers of reimbursable services (e.g., hospitals) by the appropriate trust fund. Payments under Part B for outpatient services are generally based on "reasonable charges" for services provided. Id. Sec. 1395l. As originally enacted, Part A also provided for payments based on the reasonable costs of services to the provider. Id. Sec. 1395f(b)(1). This approach to calculating reimbursements is considered "retroactive," because the amount paid by Medicare is largely a function of the costs actually incurred by the provider. In 1983, however, Congress adopted a prospective reimbursement system for inpatient services and other services reimbursable under Part A. Social Security Amendments of 1983, Pub.L. No. 98-21, Sec. 601, 97 Stat. 65, 152-62 (codified at 42 U.S.C. Secs. 1395ww(d)-(e)) (hereinafter cited as 1983 Amendments). Under this system, reimbursing payments are calculated on the basis of a predetermined fee schedule, irrespective of the provider's actual costs.
 
 
 6
 In addition to the normally applicable Medicare reimbursement rules, however, Medicare also contains a number of provisions whereby individual states may obtain waivers. Under such waivers, Medicare reimbursements to the hospitals in a state are made on the basis of a state reimbursement scheme, rather than the otherwise applicable federal system.
 
 
 7
 The first of these waiver provisions to be enacted authorized the Secretary to engage in "experiments and demonstration projects," which might include state waivers. See Social Security Amendments of 1967, Pub.L. No. 90-248, Sec. 402, 81 Stat. 821, 930-31 (hereinafter cited as 1967 Amendments); Social Security Amendments of 1972, Pub.L. No. 92-603, Sec. 222, 86 Stat. 1329, 1390-93 (hereinafter cited as 1972 Amendments) (both codified as amended at 42 U.S.C. Sec. 1395b-1). The purpose of these provisions was to discover ways of controlling costs, see generally H.R.Rep. No. 231, 92d Cong., 2d Sess. (1971), reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 5066-67 (hereinafter cited as H.R.Rep. No. 231), and waivers are available with respect to both inpatient and outpatient costs. Such waivers (hereinafter referred to as demonstration-project waivers) are entirely discretionary with the Secretary.
 
 
 8
 Congress enacted a second waiver provision in 1982. Medicare Sec. 1886(c)(1), 42 U.S.C. Sec. 1395ww(c)(1). In that section, Congress authorized the Secretary to "provide, in his discretion, that payment with respect to services provided by a hospital in a State may be made in accordance with a hospital reimbursement control system in a State, rather than in accordance with the other provisions of this title," if the State's system met each of five conditions set forth in the statute. Among these conditions is that the state plan be no more costly than the otherwise applicable Medicare system. Medicare Sec. 1886(c)(1)(C), 42 U.S.C. Sec. 1395ww(c)(1)(C).
 
 
 9
 Finally, in 1983, Congress adopted two further waiver provisions; unlike the earlier provisions, however, these mandate that a waiver be granted as long as certain statutorily-specified criteria are met. First, Congress provided for a mandatory waiver for state reimbursement plans that had previously been granted a demonstration-project waiver, and that met the criteria for a discretionary waiver in section 1886(c)(1). Medicare Sec. 1886(c)(4), 42 U.S.C. Sec. 1395ww(c)(4). Second, Congress provided for a mandatory waiver for any state meeting both the requirements of section 1886(c)(1) and an additional six requirements. Medicare Sec. 1886(c)(5), 42 U.S.C. Sec. 1395ww(c)(5).
 
 
 10
 B. The New Jersey Hospital Reimbursement Control System
 
 
 11
 New Jersey's hospital reimbursement system was initially developed under a 1976 contract between the State Department of Health and HCFA, pursuant to the Secretary's demonstration-project authority. In 1979, the State Department of Health adopted regulations for applying the system to all third-party payers and to all general acute-care hospitals in the State. See N.J.Admin.Code tit. 8, Sec. 31B-3.19(a)(3); N.J.Stat.Ann. Sec. 26:2H-1 et seq. The State thereafter obtained a demonstration-project waiver from HCFA, covering reimbursements for both inpatient and outpatient services.
 
 
 12
 The New Jersey system has four salient features. First, the system is a prospective one. Rates are set on the basis of "diagnosis-related groups" (DRGs)--generally, illnesses and courses of treatment.[1] Second, as noted above, the system applies to all third-party payers, both commercial and governmental, and to all health-care providers. Third, it covers both inpatient and outpatient services. Finally, the system reimburses hospitals for "uncompensated care"--largely care provided to indigents--by including in the DRG rate base an estimate of the cost of such care. Thus, all third-party payers under the system, including Medicare, subsidize indigent care, although such care is not normally reimbursable under Medicare.
 
 C. The Controversy
 
 13
 Following enactment of the 1983 Amendments, HCFA determined that existing demonstration-project waivers would be withdrawn, and that states desiring continued waivers would be required to reapply under section 1886(c). The agency accordingly notified New Jersey that its current waiver would only be extended until 90 days after the promulgation of final regulations under 1886(c). Several months later, however, HCFA had a change of mind, and--although no regulations had yet been promulgated--informed the State that the waiver would be revoked at the end of 1984. Accordingly, the State submitted an application under section 1886(c)(1), (c)(4), and (c)(5); the application covered both outpatient and inpatient services.
 
 
 14
 The Secretary initially rejected the application, in part on the ground that it did not provide separate treatment of inpatient and outpatient services. The Secretary took the position that although New Jersey's demonstration-project waiver covered both inpatient and outpatient services, section 1886(c) authorized only waivers for inpatient services. She indicated, however, that she had discretionary authority to grant a waiver with respect to outpatient services,[2] but that such a waiver could only be granted if the outpatient side of the state's plan, considered on its own, met criteria similar to those in section 1886(c)(1) and (c)(5).
 
 
 15
 While expressing disagreement with the Secretary's interpretation as to the scope of a section 1886(c) waiver and the requirement of a bifurcated application, the State resubmitted its application in accordance with the Secretary's expressed desires. The application indicated that the state plan, considered as a unit, would save Medicare a total of approximately $150 million during the three years of the waiver. However, this amount was a net figure--while it included a savings of approximately $207 million with respect to inpatient services, it also included a deficit with respect to outpatient services of between $30 and $55 million.
 
 
 16
 The Secretary found that the State plan, insofar as it applied to inpatient services, met each of the criteria of section 1886(c)(5),[3] and accordingly granted the waiver with respect to those services. However, she denied the State's application with respect to outpatient services, finding--as the State conceded--that that part of the plan, considered by itself, did not meet the cost-effectiveness requirement of section 1886(c)(1)(C).
 
 
 17
 New Jersey filed a complaint in the district court contending that section 1886(c)(5) required the Secretary to grant a waiver for its entire reimbursement system. The State contended that that section applied to outpatient as well as inpatient services, and that consequently the Secretary should have considered its plan as a whole in responding to its application. The court granted the State's motion for a preliminary injunction, holding that the State had demonstrated both a likelihood of success on the merits and the probability of irreparable injury if the injunction were not granted.
 
 
 18
 In holding that the State was likely to succeed on the merits, the court reasoned that because section 1886(c)(1) speaks generally of "services provided by a hospital in a State," rather than of "inpatient" services, the statute unambiguously applies to all hospital services. The court also noted that the legislative history contains no "positive indication" that the statute was limited to inpatient services.
 
 
 19
 The district court subsequently granted the State's motion for summary judgment. The court found no disputed issues of material fact, since both parties agreed that the New Jersey system, considered as a whole, would result in a savings to Medicare, and that all of the other requirements of section 1886(c) had been met. Relying on the legal analysis contained in its opinion accompanying its preliminary injunction order, the court held that section 1886(c) entitled the State to a mandatory waiver for its entire system.
 
 
 20
 On appeal, the Secretary contends that the district court erred in holding that section 1886(c)(5) provides for a mandatory waiver with respect to outpatient services. The State argues to the contrary that it applies to any state plan--including one covering outpatient services--as long as the plan, taken as a whole, meets the criteria of sections 1886(c)(1) and (c)(5). The parties agree that there exist no disputed issues of material fact, and that the only issue on review is one of statutory construction. Thus, the scope of our review is plenary.
 
 II.
 
 21
 Our approach to interpreting the statute at issue is significantly affected by the fact that the Secretary--whose duty it is to enforce the statute--has already interpreted it. The Supreme Court has made clear that under these circumstances, the reviewing court
 
 
 22
 is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 23
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue," id. at 843, 104 S.Ct. at 2782, and the agency's construction is reasonable, we must defer to that construction, although it may not be the only or even the most reasonable one. See also Wheeler v. Heckler, 787 F.2d 101, 104-05 (3d Cir.1986).
 
 III.
 A.
 
 24
 Our first task, therefore, is to determine whether Congress has directly addressed the precise issue before us in this case. We begin with the language of the statute. It must be conceded that the State's argument on this score has an appealing simplicity. Section 1886(c)(1) states that "[t]he Secretary may provide ... that payment with respect to services provided by a hospital in a State may be made in accordance with a hospital reimbursement control system in a State, rather than in accordance with the other provisions of this title." 42 U.S.C. Sec. 1395ww(c)(1). According to the State, since the statute is not by its terms restricted to inpatient services, the Secretary is without authority to read into it such a restriction.
 
 
 25
 The difficulty with this approach is that the quoted provision uses the unmodified term "services" in the context of a statute whose other parts deal exclusively with inpatient services. Section 1886 is entitled "Payments to hospitals for inpatient hospital services" (emphasis added). While the title of a statute could not, of course, override clear statutory language to the contrary, the title in this case at least points to Congress' primary area of concern. This inference is strengthened by the fact that subsections (a), (b), (d), (e), (f), and (g) of section 1886 deal by their terms solely with inpatient services.
 
 
 26
 Portions of subsection 1886(c) itself also strongly suggest that it is limited to inpatient services. For example, under subpart (c)(1)(B), the state must provide "satisfactory assurances as to the equitable treatment under the system of all entities ... that pay hospitals for inpatient hospital services" (emphasis added). Similarly, under subpart (c)(1)(D), such a plan may "not preclude an eligible organization [generally, health maintenance organizations and competitive medical plans] ... from negotiating directly with hospitals with respect to the organization's rate of payment for inpatient hospital services" (emphasis added). If, as the State contends, Congress intended waivers under subsection (c) to apply to reimbursements for outpatient services, it is far from obvious why these provisions are limited to inpatient services--why, for example, Congress would wish to permit a State plan to treat providers of outpatient services (including, perhaps, the Supplementary Medical Insurance Trust Fund) inequitably. Equally plausible, as the Secretary argues, is that Congress only intended the statute to apply to inpatient services.
 
 
 27
 Further support for this view is found in the special cost-effectiveness provision of section 1886(c)(4). As noted, that section applies only to state systems with pre-existing waivers. Under (c)(4), a State system is determined to be effective "on the basis of its rate of increase or inflation in inpatient hospital payments for individuals under this subchapter [i.e., Medicare], as compared to the national rate of increase or inflation for such payments." 42 U.S.C. Sec. 1395ww(c)(4) (emphasis added). Under the State's interpretation of the statute, this provision could potentially require the Secretary to grant a waiver to a system that is more costly than the otherwise applicable Medicare system, if increases in outpatient costs outweighed savings on inpatient reimbursements. If, on the other hand, a waiver under that provision may only extend to inpatient services, that anomalous result could not occur.
 
 
 28
 Thus, the language of the statute alone does not clearly resolve whether "services" is to be construed to mean "all services" or "inpatient services." To the extent that we are able to reach any firm conclusion from parsing the statutory language, it is that Congress was primarily concerned with state plans to the extent that they covered inpatient services, and gave little or no thought to more ambitious state plans. We turn, then, to the legislative history.
 
 B.
 
 29
 The legislative history of section 1886(c) reinforces the conclusion that Congress' overriding concern was the cost of inpatient care. Beyond that, however, it reveals little more about Congress' intent with respect to the particular issue before us than does a careful reading of the statute itself. There is certainly nothing in it evidencing a clear congressional intent that section 1886(c) extend to outpatient care. Cf. Chemical Manufacturers' Ass'n v. Natural Resources Defense Council, 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985) ("[W]e conclude that the statutory language does not foreclose the Agency's view of the statute. We should defer to that view unless the legislative history or the purpose and structure of the statute clearly reveal a contrary intent on the part of Congress"; emphasis added). Indeed, we find no mention of outpatient care anywhere in the relevant history.
 
 
 30
 Section 1886(c) was initially enacted in 1982 as part of a broad series of measures designed to reduce Medicare spending for inpatient costs. Those measures were adopted in section 101 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-248, 96 Stat. 324, 331-36 (hereinafter referred to as TEFRA); indeed, section 101 was captioned "Payment for Inpatient Hospital Services." That section included--in addition to the section 1886(c) waiver provision--direct limits on reimbursable costs, Medicare Sec. 1886(a), 42 U.S.C. Sec. 1395ww(a)(1), and a so-called target rate reimbursement system to encourage cost savings, Medicare Sec. 1886(b), 42 U.S.C. Sec. 1395ww(b), both by their terms limited to inpatient costs.
 
 
 31
 Both the House and Senate Committee reports[4] indicate that Congress was motivated by concern for the financial soundness of the Hospital Insurance Trust Fund (which, as previously noted, does not cover outpatient care). See S.Rep. No. 494, 97th Cong., 2d Sess. 24, reprinted in 1982 U.S.Code Cong. & Ad.News 781, 800 (noting that "the persistently large increases in hospital costs are now threatening the financial soundness of the Hospital Insurance Trust Fund"); House Committee Print at 25 (same). No similar concern was expressed about the soundness of the Supplementary Medical Insurance Trust Fund.
 
 
 32
 Section 601 of the 1983 Amendments, which adopted parts (c)(4) and (c)(5), was also concerned primarily with inpatient costs. That section--titled "Medicare Payments for Inpatient Hospital Services on the Basis of Prospective Rates"--adopted a nationwide prospective reimbursement system, limited again to inpatient services. Medicare Secs. 1886(d)-(g), 42 U.S.C. Secs. 1395ww(d)-(g). The legislative history of the 1983 Amendments also evidences an exclusive concern with inpatient costs. E.g., H.R.Rep. No. 25, 98th Cong., 1st Sess. 11, reprinted in 1983 U.S.Code Cong. & Ad.News 219, 228 (hereinafter cited as H.R.Rep. No. 25) (discussing long-term financial outlook for Hospital Insurance Trust Fund).
 
 
 33
 The legislative history of the 1983 Amendments indicates that state cost-control systems "provide a laboratory for innovative methods of controlling health care costs," H.R.Rep. No. 25 at 146, reprinted in 1983 U.S.Code Cong. & Ad.News at 365, and that existing state systems "have proven effective in reducing the cost of hospital care," id. at 147, reprinted in 1983 U.S.Code Cong. & Ad.News at 366. Appellees interpret these statements to mean that Congress specifically approved of existing State plans, including New Jersey's. We think this reading goes too far. If Congress simply wished to require the Secretary to extend all then-existing state waivers, it would not have required in part (c)(4) that those states, in order to qualify for a continued waiver, meet the five criteria in part (c)(1). And--in light of the exclusive focus in the legislative reports on inpatient costs--it is quite likely that the costs referred to were inpatient costs. We note that, as the Secretary has pointed out, the legislative reports often appear to use generic terms--such as "costs"--when referring only to inpatient costs. E.g., id. at 146, reprinted in 1983 U.S.Code Cong. & Ad.News at 365 (stating that state system must provide for "equitable treatment of payors," although statute specifies only payors for inpatient services). Thus, we cannot infer that Congress was concerned with outpatient costs from the fact that it spoke generally of "costs" rather than "inpatient costs."
 
 
 34
 The foregoing statements in the legislative history are valuable as indicators of the policies underlying the enactment of section 1886(c) and generally support the Secretary's position; we recognize, however, that they are not unambiguous expressions of Congress' intent with respect to the precise issue before us. Cf. Chevron, 467 U.S. at 862, 104 S.Ct. at 2791. ("The general remarks [in the legislative history] pointed to by respondents 'were obviously not made with this narrow issue in mind and cannot be said to demonstrate a Congressional desire....' "; quoting Jewell Ridge Coal Corp. v. Mine Workers, 325 U.S. 161, 168-69, 65 S.Ct. 1063, 1067-68, 89 L.Ed. 1534 (1945)).
 
 C.
 
 35
 In the absence of a clear expression of Congress' intent, we must defer to the Secretary's construction as long as it " 'represents a reasonable accommodation of conflicting [statutory] policies.' " Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. Section 1886(c) appears to serve a number of purposes--in part, perhaps, mutually limiting. Undoubtedly the most significant of these was to encourage the development of State reimbursement programs, which might prove "useful models for our national system." H.R.Rep. No. 25, at 148, reprinted in 1983 U.S.Code Cong. & Ad.News at 367. Thus, the underlying purpose was the same as that which motivated Congress to grant the Secretary power to waive normal Medicare reimbursement principles for experiments and demonstration projects in the 1967 and 1972 Amendments.
 
 
 36
 Unlike the earlier provisions (which have not been repealed), section 1886(c) does not permit waivers for systems that are not demonstrably cost-effective, no matter how valuable they might be as experiments. Cf. 1972 Amendments Sec. 222(a)(3) (indicating that "costs incurred in such experiment or project in excess of those which would otherwise be reimbursed or paid under [Medicare and Medicaid] may be reimbursed or paid to the extent that [a] waiver applies to them (with the excess being borne by the Secretary)"; emphasis added). Thus, a secondary purpose of section 1886(c) is to insure prudent management of the Hospital Insurance Trust Fund. The statute by its terms requires that the Secretary be provided "satisfactory assurances" that this goal is met.
 
 
 37
 The Secretary's construction of section 1886(c) in this case is a reasonable means of accommodating these interests. The Secretary has indicated that only by requiring separate applications for inpatient and outpatient systems can she be satisfied that the State's proposed system is cost-effective. In her view,
 
 
 38
 [o]ffsetting excess outpatient costs against projected inpatient savings or vice versa would be a tenuous proposition ... because such an offset would merely be based on projections. Given the uncertainty of projections, it would be imprudent to approve a State system that is designed to generate excess costs in one sector that are hoped to be offset by savings in another sector. There is a much greater assurance that the overall outcome of no excess costs will be achieved if neither the outpatient nor [the] inpatient portion of a system is designed to result in excess costs.
 
 
 39
 51 Fed.Reg. 15,491 (1986). We think that this judgment has a substantial basis in the policies underlying the statute and is a reasonable means of effectuating those policies. Although the Secretary's construction of the statute may give States less room to experiment with different means of controlling outpatient expenditures, in light of Congress' limited concern with those expenditures, we do not think that the trade-off effected by the Secretary is an unreasonable one.
 
 IV.
 
 40
 The State argues, however, that deference to the Secretary is inappropriate in this case. The State suggests that the Secretary's construction is entitled to little deference because her position has changed in the course of this dispute. This argument is unpersuasive. On the issue before us--whether section 1886(c) provides for a mandatory waiver with respect to state plans applying to outpatient services--the Secretary's position has remained constant. Nor has the Secretary changed her view that she has discretionary authority to grant waivers with respect to outpatient services. See supra note 2. At most, HCFA has made inconsistent statements about the source of the latter authority. This inconsistency has little significance, especially because the scope of the Secretary's discretionary authority is not before us. The case cited by the State in this regard, Securities Industry Ass'n v. Board of Governors, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984), is not apposite, since there is no indication that the position now espoused by the Secretary constitutes a "post hoc rationalization" of agency action by appellate counsel, rather than the considered view of the agency itself.
 
 
 41
 There are several additional reasons why deference to the Secretary is especially appropriate in this case. First, the Secretary's interpretation was roughly contemporaneous with the enactment of the statute. American Paper Inst. v. American Elec. Power Serv. Corp., 461 U.S. 402, 422, 103 S.Ct. 1921, 1932, 76 L.Ed.2d 22 (1983) (quoting Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). And the Secretary was an active participant in the legislative process leading to the enactment of the 1983 Amendments, including sections 1886(c)(4) and (c)(5), see S.Rep. No. 23 at 47, 98th Cong., 1st Sess., reprinted in 1983 U.S.Code Cong. & Ad.News 143, 187, as well as, of course, the many earlier developments. See Miller v. Youakim, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979); Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 915 (3d Cir.1981). In addition, the statute is one of great complexity, and the area it regulates--the financing of health-care delivery--is one in which the agency has much expert understanding.[5]
 
 
 42
 We conclude, therefore, that the Secretary's interpretation, applying section 1886(c) only to state plans to the extent that they cover inpatient services, is reasonable. Accordingly, we will reverse the judgment of the district court.
 
 
 
 [1]
 The federal system of prospective rate-setting, adopted in 1983 in section 1886, also uses a DRG approach, for which the New Jersey system was a prototype
 
 
 [2]
 The Secretary premises her authority to grant waivers with respect to outpatient services on Medicare Sec. 1871, 42 U.S.C. Sec. 1395hh. See 51 Fed.Reg. 15,496 (1986) (to be codified at 42 C.F.R. Sec. 403.321). The validity of this regulation is not before us
 
 
 [3]
 Although the State's initial application rested on Sec. 1886(c)(4) as well as (c)(5), the State no longer relies on (c)(4), apparently because of doubt about compliance with the special cost-effectiveness test of that paragraph
 
 
 [4]
 The only pertinent House legislative history from 1982 is a report drafted by the staff of the Ways and Means Committee accompanying a bill (H.R. 6878) parts of which were incorporated into TEFRA. The report (which is reprinted as an appendix to appellant's brief, and which is hereinafter referred to as the House Committee Print) was not, however, formally approved by the Committee. House Committee Print at 1. The Senate bill did not include a State waiver provision. See H.Conf.Rep. No. 760, 97th Cong. 2d Sess. 421, reprinted in 1982 U.S.Code Cong. & Ad.News 1191, 1201
 
 
 [5]
 Final regulations implementing section 1886(c) have since been promulgated. 51 Fed.Reg. 15,492 (1986) (effective May 27, 1986) (to be codified at 42 C.F.R. Secs. 403.300-.322)