**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE, Appellant,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES.**

No. 90–5298.

United States Court of Appeals, Third Circuit.

Argued Sept. 27, 1990.

Decided March 28, 1991.

As Amended May 9, 1991.

Rehearing and Rehearing In Banc Denied May 24, 1991.

Jason W. Manne (argued), Office of Atty. Gen. of Pennsylvania, Pittsburgh, Pa., for appellant.

James S. Feight, Jr. (argued), Dept. of Health and Human Services, Office of Gen. Counsel, Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge,* BECKER and WEIS, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Chief Judge.

## I.

### Introduction

The Commonwealth of Pennsylvania appeals from the district court's order of summary judgment sustaining the Department of Health and Human Services' (HHS) disallowance of $501,274.42 in federal Medicaid funds. The sanction resulted from Pennsylvania's failure to show for a total of five fiscal quarters in 1984 and 1985 that it had conducted annual reviews of the medical care provided to every long

---

* The Honorable Dolores K. Sloviter became Chief Judge on February 1, 1991.

stay Medicaid patient as required by the Social Security Act. 42 U.S.C. § 1396b(g)(1) (1988). While conceding that it missed several patients in 1984 and 1985, Pennsylvania argues that the disallowance was improper because its quarterly showings satisfied the safe harbor exceptions to the total inspection requirement. This appeal requires us to interpret the statutory language of those exceptions and the regulation adopted by the Secretary of HHS implementing them, which Pennsylvania challenges as impermissibly restrictive in several respects.

## II.

### Statutory and Regulatory Scheme

Title XIX of the Social Security Act establishes the joint state-federal Medicaid program in which the federal government reimburses participating states for a percentage of the cost of providing medical care to indigent persons. 42 U.S.C. § 1396 (1988). To be eligible for Medicaid funds, the state agency responsible for administering the program must comply with federally established standards regarding Medicaid eligibility, the scope of medical coverage, and the adoption of a system to monitor utilization of the Medicaid program. 42 U.S.C. § 1396a.

This case involves the requirement that states have an effective utilization control program in which the medical care provided to all Medicaid patients receiving long stay care [1] in institutional settings "is reviewed and evaluated at least annually by independent professional review teams." 42 U.S.C. § 1396b(g)(1). In 1972, Congress amended the Act to require the Secretary to reduce federal Medicaid funds unless in every fiscal quarter for which a state submits a request for federal reimbursement funds the state makes a showing to the Secretary that it has reviewed the care provided to each such patient within the

last year. See H.R.Rep. No. 393, 95th Cong., 2d Sess., 84, reprinted in 1977 U.S. Code Cong. & Admin.News (USCCAN) 3039, 3086. The Secretary validates a state's quarterly showing by conducting sample on-site surveys of state institutions in which long stay Medicaid patients receive medical care. 42 U.S.C. § 1396b(g)(2). If the validation survey reveals that any long stay Medicaid patient was not inspected in the last year, the federal Medicaid funds for all patients at the same level of care [2] in that fiscal quarter will be substantially reduced. Under the 1972 Act, the Secretary had no discretion in determining whether a state's incomplete showing warranted the reduction of federal funds. H.R.Rep. No. 393 at 85, reprinted in USCCAN at 3088.

As part of the Medicare–Medicaid Anti–Fraud and Abuse Amendments of 1977, Congress revised the formula for reduction of reimbursement and added two safe harbor exceptions to the strict requirement that states review every Medicaid recipient in order to avoid reduction in federal reimbursements. 42 U.S.C. § 1396b(g)(4)(B). According to the House Report which accompanied the final bill, the exceptions were included to provide "a standard of reasonableness" so as to avoid the imposition of "penalties on States which failed to review only two or three homes out of hundreds of homes subject to review within the annual time limit." H.R.Rep. No. 393 at 85, reprinted in USCCAN at 3088.

The first of the safe harbor exceptions applies if the state demonstrates that it completed on-site inspections during the last year in at least 98 percent of all facilities requiring review and in all facilities with 200 or more certified Medicaid beds [the 98%/200 bed showing], and exercised "good faith and due diligence" in attempting to inspect all Medicaid patients. 42

---

1. Long stay care is that provided to Medicaid recipients who have received inpatient services in a hospital or intermediate care facility for 60 days, in a skilled nursing facility for 30 days, or in a mental hospital for 90 days. 42 U.S.C. § 1396b(g)(1) (West Supp.1990).

2. Levels of care are divided into five types of inpatient services: hospital, mental hospital, skilled nursing facility, intermediate care facility, or psychiatric services for individuals under 21. 42 C.F.R. § 456.651 (1989).

U.S.C. § 1396b(g)(4)(B).[3] The other exception applies if the state's failure to conduct the required inspection was due to "failings of a technical nature only." *Id.*

In 1979, HHS promulgated regulations implementing the safe harbor provisions. *See* 42 C.F.R. § 456.653 (1989). The regulation pertinent here provides that the "good faith and due diligence" exception is available only if the state would have completed the review of all facilities "but for events beyond its control which it could not have reasonably anticipated." 42 C.F.R. § 456.653(a)(3).[4] The regulation as to the technical failings exception includes a requirement that the state meet the 98%/200 bed showing to qualify, but gives the state thirty days from the end of the quarter to do so. 42 C.F.R. § 456.653(b).

## III.

### Facts and Procedural History

The Pennsylvania Department of Welfare is the agency responsible for conducting the inspection of care reviews. In conducting reviews, Pennsylvania's inspection of care (IOC) teams rely on the billing and eligibility information provided by each facility to identify patients in need of review. The disallowance resulted from five unsatisfactory quarterly showings made by Pennsylvania, three in 1984 for which $200,462.09 was disallowed and two in 1985 for which $300,812.33 was disallowed.[5]

For the quarters ending March 31, 1984, June 30, 1984, and September 30, 1984, Pennsylvania failed to review four patients at Valley Crest Home (a facility with over 200 beds) and one patient at Lock Haven Hospital. In addition, for the quarters ending March 31, and June 30, 1984, Pennsylvania failed to review an entire intermediate care facility, Ramsbottom Center. For the quarters ending September 30, and December 31, 1985, Pennsylvania IOC teams missed one patient at Valley Manor Nursing Home and one patient at Camp Hill Nursing Home. Under the total inspection requirement of the statute, these facilities were deemed unreviewed and thus

3. The complete language of the relevant statutory provision is:

> (B) The Secretary shall find a showing of a State, with respect to a calendar quarter ... to be satisfactory ... with respect to the requirement that the State conduct annual onsite inspections in mental hospitals, skilled nursing facilities, and intermediate care facilities ... if the showing demonstrates that the State has conducted such an onsite inspection during the 12–month period ending on the last date of the calendar quarter—
> (i) in each of not less than 98 per centum of the number of such hospitals and facilities requiring such inspection, and
> (ii) in every such hospital or facility which has 200 or more beds,
> and that, with respect to such hospitals and facilities not inspected within such period, the State has exercised good faith and due diligence in attempting to conduct such inspection, or if the State demonstrates to the satisfaction of the Secretary that it would have made such a showing but for failings of a technical nature only.

4. The relevant language of the regulation provides:

> § 456.653 Acceptable reasons for not meeting requirements for annual on-site review. The Administrator will find an agency's showing satisfactory, even if it failed to meet the annual review requirements of § 456.652(a)(4), if—
> (a) The agency demonstrates that—

> (1) It completed reviews by the end of the quarter in at least 98 percent of all facilities requiring review by the end of the quarter;
> (2) It completed reviews by the end of the quarter in all facilities with 200 or more certified Medicaid beds requiring review by the end of the quarter; and
> (3) With respect to all unreviewed facilities, the agency exercised good faith and due diligence by attempting to review those facilities and would have succeeded but for events beyond its control which it could not have reasonably anticipated; or
> (b) The agency demonstrates that it failed to meet the standard in paragraph (a)(1) and (2) of this section by the close of the quarter for technical reasons, but met the standard within 30 days after the close of the quarter. Technical reasons are circumstances within the agency's control.
> (c) Facilities that are reviewed under paragraph (b) of this section, after the quarter in which they were due for review, retain their original anniversary quarter due date for purposes of subsequent reviews.

5. HHS' survey initially found that Pennsylvania failed to inspect nine Medicaid patients in 1984, and three recipients in 1985. This figure was revised by the Board to five in 1984 and two in 1985. App. at 51, 74.

Pennsylvania failed to satisfy its statutory obligation to review the need for and adequacy of covered nursing services "with respect to *each* patient receiving such services." 42 U.S.C. § 1396a(a)(31)(A) (emphasis added).

Pennsylvania appealed both disallowances separately to HHS' Departmental Appeals Board (Board), arguing that it had made the showings necessary to fall within the statutory safe harbor exceptions to total inspection. Initially, it relied on the exception covering "failings of a technical nature." The Board found that the technical failings exception to the annual review requirement was not available for 1984 because in each of the three quarters Pennsylvania failed to conduct a complete inspection in Valley Crest, a facility with over 200 beds, and thus it had not satisfied the requirement of the regulation that the state make the threshold 98%/200 bed showing by no later than 30 days of the close of the quarter. Board Decision No. 746, App. at 39. The Board found that although Pennsylvania met this threshold in 1985, the technical failings exception was unavailable because the incomplete showings were the result of poor administration and "poor administration or bad record keeping should not be considered a technical failing." Board Decision No. 840, App. at 73.

Pennsylvania appealed both Board decisions to the United States District Court for the Middle District of Pennsylvania.[6] Pennsylvania argued that its administrative errors were technical failings and that the Secretary's requirement that a state meet the 98%/200 bed showing within 30 days of the end of the quarter impermissibly restricted the statute. Because no material facts were in dispute, the parties filed cross motions for summary judgment. The district court affirmed the 1984 disallowance, upholding the Secretary's regulation as a reasonable interpretation of the

statute. The court remanded the 1985 disallowance to the Board for a determination whether Pennsylvania's showing satisfied the "good faith and due diligence" exception, despite the fact that Pennsylvania had not argued that this exception applied.[7]

On remand, the Board found the Secretary's interpretation of the "good faith and due diligence" exception as restricted to circumstances outside the state's control to be a reasonable construction of the statute. The Board determined that Pennsylvania's failure to complete the 1985 reviews was "attributable to an inherent weakness in its established system for recipient identification," namely its reliance on information provided by each facility and its failure "to employ [any] mechanism whatsoever to double check the accuracy of that information." App. at 117. Pennsylvania appealed, and the district court affirmed the Board's finding that the "good faith and due diligence" exception did not apply. The court also held that Pennsylvania's inadequate showing for 1985 was not due to technical failings, but was the result of "poor administration." App. at 127. It granted summary judgment to the Secretary, and Pennsylvania filed a timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1988).

IV.

*Discussion*

A.

Standard of Review

■ Before turning to the merits, we consider the degree of deference owed the Secretary's interpretation of the statute. As set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the appropriate level of deference due an agency's con-

---

6. Pennsylvania appealed Board Decision No. 746 directly to this court which transferred the case to the district court. Pennsylvania's appeal from Decision No. 840 was joined with the appeal from Board Decision No. 746.

7. In its initial opinion, the court did not consider the availability of the technical failings exception for 1985, although the state met the 98%/200 bed threshold. As noted in the text, it considered that issue when the case returned to it following the remand.

struction of a statute that it administers depends on the clarity of the statute. If "Congress has directly spoken to the precise question at issue.... [and] the intent of Congress is clear," no deference is owed an agency's inconsistent interpretation because both the agency and the reviewing court must "give effect to the unambiguously expressed intent of Congress." *Id.;* *see also Zebley v. Bowen,* 855 F.2d 67, 73 (3d Cir.1988), *aff'd,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). On the other hand, if the statute is ambiguous or is silent on the specific issue, a reviewing court must uphold the agency's regulation as long as the regulation is reasonable and is based on a permissible interpretation of the statute. *See Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83; *see also West v. Bowen,* 879 F.2d 1122, 1124 (3d Cir.1989); *Commonwealth of Pennsylvania v. United States,* 752 F.2d 795, 798 (3d Cir.1984) (when statutory language "fairly admits of several interpretations, a reviewing court must uphold the agency's interpretation if it is reasonable, notwithstanding the court's belief that some other policy was preferable").

■ Pennsylvania argues that we should not apply the deferential standard of *Chevron* because this case involves the terms of a federal/state grant. It argues that because the Medicaid program is essentially a bilateral contract between the state and federal government, courts must be wary of attempts by one party to the contract to obtain more favorable terms by regulation. It cites *Commonwealth of Massachusetts v. Secretary of HHS,* 816 F.2d 796, 801 (1st Cir.1987), *aff'd in part and rev'd in part on other grounds,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), where the court stated that "our usual deference must give way somewhat to the cooperative federalism goals of the Medicaid program." The court did not elucidate further the impact of federalism on the standard of deference.

No Supreme Court authority has suggested that the degree of deference due a regulation is dependent upon whether the underlying program is one of the numerous federal/state cooperative programs. This court, in dealing with the Aid to Families with Dependent Children statute, which is also a federal/state program, accorded deference to HHS' interpretation. *See Commonwealth of Pennsylvania,* 752 F.2d at 798. Thus, to the extent the statute at issue is ambiguous, we will apply the customary standard of deference as required by *Chevron.*[8]

### B.
### Good Faith and Due Diligence

Pennsylvania argues that its failure to complete total inspection in 1985 is covered by the statutory provision that the Secretary shall find a showing of a state to be satisfactory if the state shows that it completed inspection of 98% of all facilities and of all facilities with over 200 Medicaid beds "and that, with respect to such hospitals and facilities not inspected ... the State has exercised good faith and due diligence in attempting to conduct such inspection." 42 U.S.C. § 1396b(g)(4)(B). HHS concedes that with respect to the two calendar quarters in 1985, Pennsylvania met the 98%/200 bed threshold. Moreover, the district court determined, and HHS does not contest, that Pennsylvania made a sincere effort to examine every Medicaid patient in every facility and would have examined all of them had it not been for the inadvertent omission of the names of two patients from the list of Medicaid patients used by the state to conduct inspections.

However, HHS disallowed the exception because its regulation requires a showing that "with respect to all unreviewed facilities, the agency exercised good faith and due diligence by attempting to review those facilities *and would have succeeded but for events beyond its control which it could not have reasonably anticipated."* 42 C.F.R. § 456.653(a)(3) (1989) (emphasis

---

8. Judge Weis agrees with the court's analysis of the statute, but reached his conclusion without deference to the agency's position.

added). HHS interprets "events beyond [the state's] control" to mean circumstances such as when a review team is prevented from entering a facility due to quarantine or court order, or when severe and unpredictable weather disturbances prevent the team from getting to the facility. *See* 44 Fed.Reg. 56336 (1979). Under HHS' interpretation, where 100% inspection was possible, anything less is not "good faith and due diligence." The Board and the district court upheld the disallowance, finding "good faith and due diligence" lacking because the omissions were not due to circumstances beyond the state's control.[9]

■ Pennsylvania contends that HHS' regulation limiting that exception to "events beyond [the state's] control" is an impermissibly restrictive interpretation of the statute. Statutory interpretation begins with the "literal meaning of words employed," *Flora v. United States*, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958); *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), in this case "good faith and due diligence." Although "good faith" has been referred to as "an intangible and abstract quality with no technical meaning or statutory definition," *Black's Law Dictionary* 623 (5th ed. 1979), it is said to encompass "an honest belief, the absence of malice, and the absence of a design to defraud." *Id.* Because "good faith" focuses on the intent of the state in attempting to conduct inspections, it necessitates a subjective inquiry. *Cf. Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir. 1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) ("good faith" in the context of the Equal Pay Act).

■ In contrast to the subjective quality of "good faith," "due diligence" is defined as "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reason-able and prudent man under the particular circumstances." *Black's Law Dictionary*, at 411. Thus, the words of the statute require the consideration of both subjective and objective factors in evaluating a state's attempt to inspect facilities. However, because the Secretary's interpretation imposes as a threshold the objective determination of whether the omissions were due to reasons beyond the state's control, the subjective factor is completely eliminated in most situations.

■ This interpretation suffers from two defects. First, courts should avoid a construction of a statute that renders any provision superfluous. *See United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *In re Co Petro Marketing Group*, 680 F.2d 566, 569–70 (9th Cir.1982). When possible, every word Congress used should be given effect "so that no part will be inoperative or superfluous, void or insignificant." 2A *Sutherland Statutory Construction* § 46.06 at 104.

Second, such a construction is inconsistent with Congress' intent, reflected in the Conference Report, that "[i]f a facility is not reviewed, there will be a reduction in matching unless the Secretary finds there was a *good faith attempt* to review the institution, and there is no evidence that any institution, or kind or type of institution, is *deliberately* not reviewed." H.R. Conf. Rep. No. 673 at 48, *reprinted in* USCCAN at 3122 (emphasis added). It follows that the state's subjective intent is an element that should be considered in evaluating the showing made by it to explain its failure to inspect. *See Delaware Div. of Health and Social Serv. v. H.H.S.*, 665 F.Supp. 1104, 1124 (D.Del.1987) ("The cynosure of the statute is on the intentions of the State; the emphasis of the regulations is on proving something other than the State's intentions.").

---

9. In its decision, the Board stated that HHS' definition "embodies [HHS'] programmatic judgment that a state exercising the diligence which a state should exercise in medical reviews would be able to meet the annual review re-quirements unless prevented from doing so due to circumstances beyond the state's control." Board Decision No. 1014 at 9–10, App. at 116–17.

HHS argues that its construction finds support in the legislative history of the 1977 Amendment. It refers to the Senate Report, which provides that the Secretary should "waive a reduction otherwise required by law to be imposed if the State's noncompliance is technical or due to circumstances beyond its control." S.Rep. No. 453, 95th Cong., 1st Sess. 41 (1977). We find the Senate Report to be problematic support for HHS' interpretation because the Senate and House versions were combined at conference and the "beyond its control" language was deleted.

The Conference Report summarized the House version, the Senate version, and the conference agreement as follows:

> *House bill.*—The House bill specifies that if a State makes a good faith attempt to perform reviews of all institutions, and actually reviews all large institutions and 98 percent of all other institutions, it will be considered in full compliance ...
>
> *Senate amendment.*—The Senate amendment provides that [the Secretary may waive a disallowance] if he determines that the State's noncompliance is technical or due to circumstances beyond control of the State.
>
> Conference agreement.—The conference agreement provides that good faith attempts to perform reviews of all institutions, and actually [sic] reviews all large institutions and 98 percent of all other institutions (or fails to meet this standard only for technical reasons), it [sic] will be considered in full compliance with the requirements of the law.

H.R. Conf. Rep. No. 673 at 48, *reprinted in* USCCAN at 3122.

■ Because the Conference had before it the Senate's suggestion for an exception due to "circumstances beyond control of the state" and did not include it, but adopted instead a version closer to that offered by the House, we believe HHS may not reinsert the omitted language by regulation.

HHS argues that its construction of the term "good faith and due diligence" is consistent with its long-standing practice, which preceded the 1977 Amendments, of finding incomplete showings to be satisfactory where the omissions were due to factors beyond the state's control. Although both the Secretary and Congress sought to alleviate the harsh consequences of the 100% review requirement, it does not follow that Congress necessarily ratified this particular aspect of the Secretary's long-standing practice.

■ Nor are we persuaded by the fact that the Secretary adopted this interpretation soon after Congress amended the statute.[10] We recognize that a contemporaneous interpretation of a statute by the agency responsible for its administration is "an invaluable aid in determining the meaning of a doubtful statute." 2A *Sutherland Statutory Construction* § 49.03 at 353 (4th ed.1984); *see also Kean v. Heckler,* 799 F.2d 895, 903 (3d Cir.1986) (deference to Secretary's interpretation is especially appropriate because her construction was "roughly contemporaneous with the enactment of the statute"); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). However, when that construction finds no support in the words of the statute, and the legislative history rather clearly suggests otherwise, the fact that the administrative interpretation was adopted soon after the statute was amended cannot be dispositive.

■ According to HHS, if the statute is read as Pennsylvania construes it, the "good faith and due diligence" exception would be "applicable to almost every fail-

---

10. In a program circular sent soon after the enactment of the 1977 amendment, HHS explained that:

> Before section 1903(g) was amended ... the Department had interpreted the statute not to require the Secretary to find a showing unsatisfactory where, although the State had attempted to perform a timely review, it was impossible to do so for reasons entirely beyond the State's control. The new section 1903(g)(4)(B) in effect makes explicit the Department's interpretation of the requirement of section 1903(g)(1)(D).

HHS Program Instruction No. 77–106 at 6 (November 11, 1977), App. at 25.

ure that was not intentional or due to some sort of gross negligence." Brief of Appellee at 24. HHS' argument overlooks the statutory "and" between the terms. This requires consideration not only of the state's "good faith" but also its "due diligence." The latter term includes an assessment of the reasonableness of the state's actions. A state that has adopted an unreliable method for reviewing Medicaid recipients or that failed to apply a valid method reasonably would not have exercised "due diligence," despite its sincere, "good faith" efforts. We conclude that the Secretary's inclusion of the "beyond its control" condition into "good faith and due diligence" is not supported by the statute.

◼ We must next consider whether this error of law affected the Board's determination that Pennsylvania had not made the requisite showing of good faith and due diligence. The district court found that Pennsylvania made a sincere effort to inspect every patient, and did not deliberately miss any patient or type of facility. This amply satisfies the subjective component of "good faith." Thus, the only issue is whether Pennsylvania satisfied the objective "due diligence" component.

Although Pennsylvania's omission leading to its disallowance for 1985 was limited to the failure to review two recipients, the Board believed that this was a serious default, stating "Pennsylvania provided no evidence of why these patients were unreviewed, but merely alleged that they were simply not included as recipients on the facility lists." App. at 117. The Board explained that Pennsylvania chose to rely on the lists provided by the facilities, and did not explain why it could not have had some other back-up system or why it was reasonable to rely on the facilities. Finally, the Board noted that Pennsylvania had not provided evidence that it gave the facilities or the review teams any instructions that would assure that all recipients within the facility would be identified, and noted that its "experience with other states indicates that even minimal steps might have

avoided missing the patients here." App. at 118.

Pennsylvania responds that the agency's finding was based on only two patients missed in 1985, and that the state inspected over 54,000 patients that year. We recognize, as HHS argues, that the two patients referred to were found in a sampling made by HHS and, using ordinary statistical rules, we might be able to conclude that the sampling, when applied to the total patient population, would suggest a higher number of missed patients. However, the record before us is barren of the number included in the sample, and HHS has not provided us with any basis on which to project a larger number of patients actually missed. If indeed only two patients of 54,000 were missed in Pennsylvania's review, there might be some room in the "good faith and due diligence" language for a de minimus application. See H.R. Rep. No. 393 at 85, *reprinted in* USCCAN at 3088.

◼ Pennsylvania also argues that "while the [Board] has criticized Pennsylvania's system for identifying patients subject to inspection, it is undisputed that even States with computerized systems make mistakes and are subject to sanction." Brief of Appellant at 17. We find this response less persuasive. Although Pennsylvania argues that "[a]ll the omissions in this case were due to inadvertent administrative errors," we believe that whatever the parameters of "due diligence," Pennsylvania cannot excuse its failure to establish a system to avoid such administrative errors by arguing that even such a system would be imperfect. Although "due diligence" cannot be read to require perfection, because otherwise the safe harbor exception to total review would be meaningless, it certainly places upon the state the responsibility to establish a reliable system of review.

◼ Nonetheless, we are sufficiently concerned that the error of law reflected in the regulation may have tainted the Board's determination that we cannot affirm the disallowance for 1985 on the basis of the record before us. For example, al-

though Pennsylvania did explain that there had been a search by an inspection team member through the institutions' records to find the eligible patients and that there was some question about the status or eligibility of both of the patients missed, the Board summarized the basis for its disallowance as follows: "We find that the Commonwealth did not provide acceptable reasons to show that its failure was attributable to circumstances beyond its control which it could not reasonably anticipate." App. at 109. We cannot tell what the Board would have found had it not believed that a disallowance could be based on the failure to show circumstances beyond the state's control.

■■■ On the other hand, we believe that if the state's failure to inspect even two patients was in fact due to an inherent weakness in its system for conducting reviews, the Board would have been justified in finding that the state failed to exercise due diligence. However, it is evident that the "inherent weakness" finding may have been affected by the flawed legal standard, because the Board stated: "Pennsylvania's failure to review two recipients is attributable to an inherent weakness in its established system for recipient identification, *rather than any circumstances outside of its control* which prevented the reviews from taking place." App. at 117 (emphasis added).

Although we are reluctant to prolong these administrative proceedings, we believe that Pennsylvania should be given the opportunity to produce evidence that it had a reasonable system in place which was designed to accomplish the statutory goal of total inspection without consideration of whether the failure to inspect the two patients missed was due to circumstances beyond its control. It follows that we must remand for further proceedings on the issue of whether Pennsylvania exercised the due diligence needed to bring it within the safe harbor exception for the two 1985 quarters at issue.[11] Such a remand is con-

sistent with our precedent of asking an agency to reconsider the record after we have clarified the standard so that it can decide the relevance of evidence that may previously have appeared irrelevant or unnecessary. *See, e.g., Marx v. Director, Office of Workers' Compensation Programs, United States Dept. of Labor,* 870 F.2d 114, 121 (3d Cir.1989) (construing regulation implementing provision of Black Lung Benefits Act and remanding case to agency to give petitioner opportunity to produce further evidence under clarified standard).

## C.

### Technical Failings

Pennsylvania also argues that the district court erred in upholding the Board's determination that the state failed to bring its showings for the 1984 and 1985 quarters within the safe harbor exception covering technical failings. The Board and the district court accepted HHS' position, reflected in its regulation, that a state cannot avail itself of the technical failings exception unless it has met the 98%/200 bed standard before the end of the quarter or "met the standard within 30 days after the close of the quarter." 42 C.F.R. § 456.653(b) (reproduced at footnote 4, *supra*). The technical failings exception was deemed unavailable to Pennsylvania for the three 1984 quarters because, as noted above, Pennsylvania had not fully inspected every 200 bed facility. Nor was the exception applied to Pennsylvania for the two quarters in 1985 because the Board and the court accepted HHS' conclusion that the reasons for the violations in those quarters did not qualify as "technical" ones.

With respect to the 1984 quarters, Pennsylvania argues that the regulation, which connects the technical failings exception to the state's satisfaction of the 98%/200 bed standard, is not supported by the statute. Although HHS makes somewhat inconsist-

---

**11.** Because Pennsylvania did not meet the 98%/200 bed threshold for 1984, the good faith and due diligence exception is unavailable to it as the basis for challenging the disallowance for the three 1984 quarters.

ent statutory arguments,[12] it appears relatively clear that it has interpreted the statutory 98%/200 bed standard to apply to both the "good faith and due diligence" exception and the technical failings exception. HHS reads the last clause of section 1396b(g)(4)(B), "that it would have made such showing but for failings of technical nature only," as referring to the 98%/200 bed standard.

An entirely different construction of the statute, and one that may well be more plausible, can be adopted, under which the showing that is excused for "failings of a technical nature" is the showing of 100% on-site inspection otherwise required by paragraph (1) of section 1396b(g). This paragraph provides that the federal medical assistance percentage due a state shall be decreased unless the state "makes a *showing* ... that, with respect to each calendar quarter for which the State submits a request for payment ... such State has an effective program of medical review of the care of patients in [qualifying facilities] whereby the professional management of each case is reviewed and evaluated at least annually by independent professional review teams." 42 U.S.C.A. § 1396b(g)(1) (emphasis added).[13]

Thus, a viable reading of section (4)(B) is demonstrated by reading only the shaded statutory language:

(B) ~~The Secretary shall find a showing of a State, with respect to a calendar quarter under paragraph (1), to be satisfactory under such paragraph with respect to the requirement that the State conduct annual onsite inspections in mental hospitals, skilled nursing facilities and intermediate care facilities~~, ... if the showing demonstrates that the State has conducted such an onsite inspection during the 12–month period ending on the last date of the calendar quarter—

(i) in each of not less than 98[%] of the number of such hospitals and facilities requiring such inspection, and

(ii) in every such hospital or facility which has 200 or more beds,

and that, with respect to such hospitals and facilities not inspected within such period, the State exercised good faith and due diligence in attempting to conduct such inspection, or ~~if the State demonstrates to the satisfaction of the Secretary that it would have made such a showing but for failings of a technical nature only~~.

42 U.S.C. § 1396b(g)(4)(B).

Under this reading, the "showing" in the last clause which is excused for technical failings refers back to the "showing ... under paragraph (1) [i.e. the 100% inspection showing required under section 1396b(g)(1)]." This interpretation would limit the 98%/200 bed standard to the "good faith and due diligence" safe harbor exception only.

The language of the statute is opaque and the legislative history of no help on this issue. However, even if HHS were correct and the relevant "showing" in the technical failings exception refers to the 98%/200 bed standard, nothing in the statute supports a regulation that conditions the availability of the technical failings exception to those states that *meet* that standard, whether by the end of the quarter or 30 days thereafter. The statutory language allows the Secretary to excuse a state that *"would have made* such a showing." In contrast, the regulation requires making such a showing. Whether the "showing" is 100% inspection or the 98%/200 bed inspection, we see no justification for a regulation which changes the essence of the statute in such a significant manner. It follows that we cannot uphold the failure to apply the technical failings exception to the 1984 quarters for the rea-

---

12. At one point in its brief, HHS says that "the legislative history appears to read the statute to require a completion of a '100% review' within the 'grace period,' rather than simply meeting the '98/200 bed standard' as does defendant's regulation." Brief of Appellee at 19.

13. The language in the text is taken from the 1990 amendment which did not change the substance of the provision from that contained in the 1983 version. The requirement for on-site inspection is found in 42 U.S.C. § 1396a(a)(31), incorporated into 42 U.S.C. § 1396b(g)(1).

son given by HHS, which was the failure to meet the 98%/200 bed standard.

Therefore, we must consider whether we can uphold the agency's determination that Pennsylvania has not satisfied the technical failings safe harbor provision on the ground that Pennsylvania failed to show that its violations were due to "failings of a technical nature only." Once again, we are faced with a phrase without definition in the statute and with but little guidance in the legislative history. We turn therefore to the dictionaries.

After eliminating those definitions that are patently inapplicable in this context, we find a glimmer of aid from others. One definition of "technical" is "immaterial, not affecting substantial rights, without substance." *Black's Law Dictionary* at 1312. In ordinary parlance, one speaks of a requirement as being a "technical" one. A synonym given for "technical" is "technicality," *see Webster's Third New International Dictionary* 2348 (1976), which itself is defined as "a detail that has meaning only for the specialist." *Id.*[14]

We are advised that it has been the Secretary's practice to find technical failings only in "extraordinary circumstances which the state (albeit perhaps with great difficulty) could have addressed by using alternative solutions." Brief of Appellee at 20. Examples provided by HHS of extraordinary circumstances include: (1) the incapacity or death of an inspection team member requiring his or her replacement; (2) civil disorders that may require diversion of state personnel; (3) destroyed or delayed access to records needed to make accurate inspection decisions; and (4) strikes by state employees that result in disruption of staff needed to conduct reviews. *Id.*

There is support in the Conference Report for a restricted interpretation of "technical reasons" because the Report states, "the conferees stress that the intent of the law that *all* facilities be reviewed is not changed by [the safe harbor] provision." H.R.Conf.Rep. No. 673 at 48, *reprinted in* USCCAN at 3122. Moreover, the safe harbor provisions were a portion of a larger package of legislation designed "to strengthen the capability of the Government to detect, prosecute, and punish fraudulent activities under the medicare and medicaid programs." H.R.Rep. No. 393 at 1, *reprinted in* USCCAN at 3040. On the other hand, we must give some effect to what little legislative guidance we can glean from the available history. There is one clue. The technical failings exception originated in the Senate. The Senate Report stated: "[t]echnical noncompliance for example, would include instances where a State had reviewed patients in most facilities on time with the remaining facilities also reviewed but not until several weeks after the deadline for completion of all reviews by a State." S.Rep. No. 453 at 41.

Coincidentally, one of Pennsylvania's violations in 1984 was the failure to inspect Ramsbottom, an intermediate care facility for the mentally retarded with less than 200 certified Medicaid beds, during the quarter ending June 30, 1984. The Administrator of the Division of Nursing Home Operations filed an affidavit stating that the on-site review was ultimately done on July 11, 1984. The affidavit explained that the failure to actually review the facility during the previous quarter was attributable "to reassignment of a Ramsbottom team member to another review team, to cover for an ill team member, and the need for a Ramsbottom team member to attend certain fair hearing proceedings." App. at 47. If the only violation was that the review was performed eleven days late, it would appear to be the type of failure that Congress intended to be attributed to technical reasons, and hence within the safe harbor exceptions.

■ Unfortunately, neither the Board nor the district court considered this issue

---

**14.** Pennsylvania does not challenge the Secretary's construction of technical failings as "circumstances within the [state] agency's control." 42 C.F.R. § 456.653(b). That interpretation, which may have been designed to contrast with the Secretary's construction of the "good faith and due diligence" as limited to circumstances beyond a state's control, does not offer any assistance to the inquiry before us.

because their analysis of the 1984 disallowance stopped when they determined that the state failed to meet the 98%/200 bed standard by the end of the quarter or within 30 days thereafter. We have determined that this condition cannot be supported by the statute. It may be that viewed without that condition some of Pennsylvania's other 1984 violations would also be found to satisfy the technical failings exception. We do not think we should perform that analysis in the first instance. We will therefore remand so that the district court can determine whether there is sufficient information in the record to ascertain whether some of the violations for 1984 were technical or whether it must remand to the Board once again to apply the exception.

▇▇▇ The Board did consider and reject Pennsylvania's contention that its failure to review two patients in two facilities in 1985 was the result of technical failings. It held that "a finding that the technical failings exception applies cannot be based on the number of violations alone," and rejected the argument "that a few unexcused individual reviews missed in the overall annual review constitute mere 'technicalities.'" Board Decision No. 840 at 7, App. at 73. The Board stated, "we generally agree with the basic principle underlying [HHS'] position that poor administration or bad recordkeeping should not be considered a technical failing." App. at 73. Although we cannot confidently proffer a definition of technical failing beyond the one situation of a later inspection for which there is legislative history, we agree that poor administration cannot be excused as a technical failing.[15]

We will therefore affirm the court's order upholding the disallowances for 1985 under the technical failings exception, but will remand for reconsideration of the disallowances for 1984 as technical failings because the Board never considered whether Pennsylvania had made an adequate showing with respect to these quarters.

## V.

### *Conclusion*

For the reasons set forth, we will vacate the district court's grant of summary judgment and remand for reconsideration in light of the principles set forth in the foregoing opinion. It may be helpful for the district court and the Board if we summarize the purpose of the remand. We have held that the regulation conditioning application of the "good faith and due diligence" exception on circumstances beyond the control of the state is based upon an impermissible interpretation of the statute. Because the failure of Pennsylvania to meet that condition appears to have played a significant role in the disallowance of the safe harbor exception for 1985, we will remand for reconsideration under the correct legal standard. It will be for the district court to decide whether a remand to the Board is necessary for its reconsideration with or without additional evidence.

We have also held that the regulation as to technical failings is impermissibly narrow because HHS has conditioned this exception upon meeting the 98%/200 bed standard whereas the statute provides for the technical failing exception to excuse meeting the relevant standard. Because the Board never considered whether Pennsylvania met the technical failings exception for 1984, having pretermitted that inquiry for reasons we conclude are impermissible, we will remand to the district court with direction that it remand to the Board. We will affirm the district court's order insofar as it affirmed the Board's disallowance of the technical failings exception for 1985. Each party to bear its own costs.

---

**15.** We would welcome administrative regulations that clarify the meaning of the statutory term "failings of a technical nature only" and

which set forth the conditions under which that exception applies.