898 F.2d 907
 58 USLW 2558, RICO Bus.Disp.Guide 7441
 SMITH, Annabelle and Coplin, Charles, Coplin, Margaret, Appellants,
v.
FIDELITY CONSUMER DISCOUNT CO. and Silver, Jerry and Gorson,
Marshall and Kutner Buick, Inc. and Samson Motors, Inc.
 No. 88-1444.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 29, 1988
Opinion filed on June 27, 1989 in Nos. 88-1406 and 88-1444.
Opinion Withdrawn as to Nos. 88-1406 and
88-1444 and, As Modified, filed on
March 15, 1990.
 
 Jeffrey S. Saltz (argued), Alan S. Kaplinsky, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for appellees.
 Eric L. Frank (argued), David A. Searles, Community Legal Services, Inc., Law Center Northeast, Philadelphia, Pa., for appellants.
 Alan C. Gershenson, Dennis H. Replansky, Leonard A. Bernstein, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for amicus curiae Pennsylvania Financial Services Ass'n.
 Jordan Luke, Gen. Counsel, Dorothy Nichols, Sr. Associate Gen. Counsel, Thomas T. Segal, Associate Gen. Counsel, Charlotte Kaplow, Asst. Gen. Counsel, Thomas L. Holzman, Sr. Trial Atty., Office of Thrift Supervision Dept. of the Treasury, Washington, D.C., for amicus curiae Office of Thrift Supervision.
 Frank M. Salinger, Robert E. McKew, American Financial Services Ass'n., Washington, D.C., Craig Ulrich, Consumer Bankers Ass'n., Arlington, Va., Thomas A. Pfeiler, U.S. League of Sav. Institutions, Chicago, Ill., for amicus curiae American Financial Services Ass'n, Consumer Bankers Ass'n and United States League of Sav. Institutions.
 Before SEITZ,* STAPLETON and COWEN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This appeal requires us to answer a discrete, but important, legal question: Does Sec. 501(a) of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), 94 Stat. 165, codified as amended, 12 U.S.C. Sec. 1735f-7a(a)(1),[1] preempt a state usury law's application to loans secured by first liens on residential property that were obtained by borrowers to finance the purchase of used cars? We hold, as did the district court, 686 F.Supp. 504, that it does. As this conclusion is dispositive of plaintiffs' claims under the Pennsylvania Usury Law, 41 P.S. Secs. 502-504, as well as their claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 et seq., and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. Sec. 201-1 et seq., we affirm the final judgment entered below granting the defendants' motion for summary judgment on these claims.
 
 I.
 
 2
 Plaintiffs Annabelle Smith, Charles Coplin and Margaret Coplin have filed this appeal from a final judgment entered against them.[2] The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1331 as well as the doctrine of pendent jurisdiction. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 
 3
 The plaintiffs' appeal is actually a cross-appeal to an appeal by the defendants in this same litigation; the appeal of the defendants has been disposed of by an opinion of even date that thoroughly discusses the relevant facts. See Smith v. Fidelity Consumer Discount Company, 898 F.2d 896 (3d Cir.1990). Hence, our factual recitation will be brief.
 
 
 4
 The plaintiffs' claims arose from loans extended to them, or their relations, by defendant Fidelity Consumer Discount Corporation ("Fidelity"), a wholly-owned subsidiary of Equitable Credit and Discount Company ("Equitable").[3] In each of the loan transactions, Fidelity gave credit to a borrower to buy a used car and received as security a first lien on the borrower's (or a cosigner's) home. Plaintiffs' claims under the Truth-in-Lending Act, 15 U.S.C.A. Sec. 1601 et seq. in connection with these loans are addressed in our companion opinion. Here, we address plaintiffs' allegations that the loans violated the Pennsylvania Usury Laws.[4]
 
 
 5
 The sole issue presented by this claim is whether the district court correctly held that Sec. 501(a) of DIDMCA preempts Pennsylvania's usury laws with respect to these transactions. It is undisputed that, absent preemption, Fidelity will have violated these statutes, the most generous of which allows lenders to charge up to 24% interest per annum. Consumer Discount Company Act, 7 P.S. Sec. 6201 et seq. In this case, Fidelity wrote loans with disclosed annual interest rates ranging from approximately 31% to 41%. Moreover, Fidelity required, as a condition of extending credit, that the borrowing parties satisfy all existing liens on their homes, accomplished in one case by lending the borrower additional money at interest rates higher than the outstanding loans, to enable Fidelity to obtain a first lien on the borrower's or cosigner's home.
 
 II.
 
 6
 This is the kind of case in which we need to remain mindful of Lord Campbell's admonition that "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." East India Company v. Paul, 7 Moo. P.C.C. (1849). However we may feel about the defendants' interest rates and business practices, it is our duty to give effect to that construction of Sec. 501(a)(1) of DIDMCA that is most consonant with its text, its legislative history and the interpretations of the agency entrusted to administer DIDMCA.
 
 
 7
 In exercising our plenary review over the district court's interpretation of the statute, Grocery Town Market, Inc. v. United States, 848 F.2d 392, 394 (3d Cir.1988), we are guided by well-settled principles of statutory construction. "We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). While the Supreme Court has sometimes said that statutory interpretation should halt at such time as the court determines the text at issue to be plain and unambiguous, see e.g. Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981), it has also indicated that the plain meaning rule is "an axiom of experience" and does not preclude consideration of persuasive legislative history if it exists; the "circumstances of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect." Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (citations omitted). As we look to the legislative history, however, we must remember that " '[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.' " Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (quoting, United States v. American Trucking Ass'n, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)). In sum, if the statutory language is clear and plain, a court must give it effect unless the legislative history is such that a literal reading "will produce a result demonstrably at odds with the intention of [the] drafters," Id. 458 U.S. at 571, 102 S.Ct. at 3251, or in other words, "would thwart the obvious purposes of the ... [statute]." Mansell v. Mansell, --- U.S. ----, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989); see also United States v. Ron Pair Enterprises, Inc., --- U.S. ----, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); United States v. Turkette, 452 U.S. 576, 593, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981); Ford Motor Credit Co. v. Cenance, 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1981); GTE Sylvania, 447 U.S. at 108, 100 S.Ct. at 2056; Consumer Party v. Davis, 778 F.2d 140, 147 (3d Cir.1985) ("An interpretation contrary to the plain meaning of a statute is justifiable only in the presence of clear indications of legislative intent....").
 
 
 8
 Another principle of statutory interpretation is relevant in this case. In a case where the statute's language and legislative history do not speak directly to the issue before the court, the court must uphold a construction of the statute rendered by the agency entrusted with the responsibility for administering and interpreting it if the administrative interpretation "is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984). If such an agency has rendered a relevant construction of the statute, our approach to "interpreting the statute ... is significantly affected" and if the "agency's construction is reasonable, we must defer to that construction, although it may not be the only or even the most reasonable one." Kean v. Heckler, 799 F.2d 895, 899 (3d Cir.1986).
 
 A.
 
 9
 With the foregoing principles in mind, we turn to the statute. Section 501 of DIDMCA provides in pertinent part:
 
 
 10
 The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is--
 
 
 11
 (A) secured by a first lien on residential real property, by a first lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, or by a first lien on a residential manufactured home;
 
 
 12
 (B) made after March 31, 1980; and
 
 
 13
 (C) described in section 527(b) of the National Housing Act....
 
 
 14
 12 U.S.C. Sec. 1735f-7a (emphasis added).
 
 
 15
 Thus, for the Pennsylvania state usury laws to be preempted here, all three of the requirements outlined above must be met. The parties agree and the district court found that subsections (B) and (C) are clearly established. Our task is to determine whether subsection (A) is satisfied here.
 
 
 16
 A literal reading of the phrase "any loan ... secured by a first lien on residential property" clearly encompasses the transactions in this case. See Bank of New York v. Hoyt, 617 F.Supp. 1304, 1309 (D.R.I.1985) ("Section 501(a)(1) contains plain and unambiguous language. The usual rule dictates that a court apply such a statute without embroidery, according to its terms.") In each case, Fidelity obtained a first priority security interest against the borrowers' real property. This much is beyond dispute. Hence, plaintiffs bear the heavy burden of demonstrating that giving effect to the plain meaning of subsection (A) "would produce results demonstrably at odds with the intention of the drafters." Ron Pair Enterprises, Inc., 109 S.Ct. at 1031.
 
 B.
 
 17
 The plaintiffs' chief argument is that Congress' intent was to limit the preemptive force of Sec. 501(a) to purchase money mortgages. They base this argument primarily on the legislative history of this section.
 
 
 18
 DIDMCA was passed at a time when inflation and interest rates were soaring; in this context, state usury laws decreased the availability of home mortgage loans and hindered the ability of financial institutions to pay market rates of interest to depositors since usury laws limited them to lending at rates well below those that the market would have dictated. Thus, the Senate Report that accompanied the bill containing what became Sec. 501 of DIDMCA found:
 
 
 19
 that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with such usury laws, it also frustrates national housing policies and programs....
 
 
 20
 The committee believes that this limited modification in state usury laws will enhance the stability and viability of our Nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending.
 
 
 21
 In addition to the adverse effects of usury ceilings on credit availability, mortgage rate ceilings must be removed if saving and loan institutions, as directed by other provisions of [the Act], are to begin to pay market rates of interest on savings deposits. Without enhancing the ability of institutions to achieve market rates on both sides of their balance sheets, the stability and continued viability of our nation's financial system would not be assured. Thus, Federal preemption of State usury ceilings would not only promote national home financing objectives but would provide the resources with which savers could be paid more interest on their savings accounts.
 
 
 22
 S.Rep. No. 368, 96th Cong. 2d Sess. 19 (1980), reprinted in, 1980 U.S.Code.Cong. & Admin.News 236, 254-255 (emphasis added).
 
 
 23
 As Judge Selya found in the Hoyt case, "[t]he concerns of the Congress can thus be seen as two-fold: (i) to promote the stability and viability of financial institutions by allowing them to charge and collect realistic market interest on mortgage loans, and (ii) to promote the national housing policy and the American dream of homeownership by legislatively opening a spigot which would insure an increased and evenly-spread flow of available mortgage money." 617 F.Supp. at 1311. These concerns about the health of financial markets and the health of the housing industry, though interrelated, are distinct.
 
 
 24
 If Congress' sole interest had been in promoting the greater and more evenly distributed availability of purchase money mortgages, plaintiffs would have a stronger, but by no means compelling, argument that a plain meaning reading of subsection (A) is at variance with Congress' intent. However, Congress also wished to provide lending institutions with revenues from which to pay depositors market rates of interest. This purpose is rationally advanced by allowing these institutions to provide credit at market rates to any borrower willing to use her home as collateral, whether the proceeds of the loan are to be used to purchase a new home, improve an existing one, or for some other purpose.
 
 
 25
 Had Congress chosen to preempt state laws only insofar as they inhibited the availability of purchase money mortgages, it could have easily done so. Indeed, as originally enacted by Congress, the statutory provision we are here called upon to construe provided for a usury exemption for:
 
 
 26
 [A]ny loan ...
 
 
 27
 secured by a first lien on residential real property, by a first lien on stock in a residential cooperative housing corporation where the loan ... is used to finance the acquisition of such stock, or by a first lien on a residential manufactured home.
 
 
 28
 DIDMCA, Pub.L. No. 96-221, Sec. 501(a)(1)(A), 94 Stat. 132, 161 (emphasis added). Thus, Congress focused specifically on the distinction between loans secured by first liens and purchase money loans so secured, and with respect to loans secured by first liens on cooperative housing stock, decided originally to preempt state usury laws only when the loans were purchase money loans. Congress did not similarly restrict the preemptive force of Sec. 501 with respect to loans secured by first liens on residential real property or residential manufactured homes. Moreover, Sec. 501(a)(1)(A) was ultimately amended to remove the language restricting usury preemption in the cooperative housing context to cases where the loan is used to finance the acquisition of the cooperative housing stock.
 
 
 29
 Congress could have provided for the preemption of state usury laws with respect to any loan "secured by a first lien on residential real property used to finance the acquisition of such property." We think its failure to do so in this context can hardly have been inadvertent. In short, we believe that if Congress had intended to limit the preemptive effect of Sec. 501 in this manner, it "would have so stated in the language of the provision." Paskel v. Heckler, 768 F.2d 540, at 546 (3rd Cir.1985); see also Federal Savings and Loan Insurance Corporation v. Ticktin, --- U.S. ----, 109 S.Ct. 1626, 1629 n. 5, 104 L.Ed.2d 73 (1989).
 
 
 30
 The most that can be plausibly argued from the plaintiffs' perspective is that the legislative history contains no affirmative evidence that Congress desired transactions involving used car loans secured by first liens on residential real property to be free of the constraints imposed by state usury laws. But it is, of course, "not the law that a statute can have no effects which are not explicitly mentioned in its legislative history," Pittson Coal Group v. Sebben, 488 U.S. 105, 109 S.Ct. 414, 420-421, 102 L.Ed.2d 408 (1988), be they good or ill. The relevant question is not whether a result inconsistent with the literal language of the statute is consistent with the legislative history, but rather whether it is compelled by that history.
 
 
 31
 The unqualified statutory language is not limited by any reference to the purpose of a loan. We decline plaintiffs' invitation to read such a limitation into the statute not only because there is no affirmative support for it in the legislative history, but also because we believe that doing so would create undesirable uncertainty in the nation's financial markets. It is in the best interests of all participants in such markets, lenders, borrowers and depositors alike, that financial institutions be able to plan their lending practices in reliance upon a predictable and clear interpretation of Sec. 501. We believe that considerable mischief would be created if courts abandoned the unqualified language of the statute and attempted to divine, on a case-by-case basis, what loans falling within the literal words of Sec. 501 Congress might not deem worthy of the shelter provided by that section.
 
 
 32
 As the legislative history does not convince us that there existed a clearly expressed congressional intent contrary to the plain words of subsection (A) of Sec. 501(a)(1) of DIDMCA, we conclude that the transactions here were loans secured by a first lien on residential real property for purposes of that subsection, and that the Pennsylvania usury laws are preempted.
 
 C.
 
 33
 Even if the statute's application in this context were ambiguous, our conclusion would be the same. Section 501(f) of DIDMCA, 12 U.S.C. Sec. 1735f-7a(f), authorizes the Federal Home Loan Bank Board "to issue rules and regulations and to publish interpretations governing the implementation of this section."[5] Pursuant to this authority, the Board has issued a regulation defining the scope of Sec. 501(a)(1)(A) as follows:
 
 
 34
 (a) Loans mean any loans, mortgages, credit sales, or advances
 
 
 35
 * * * * * *
 
 
 36
 (c) "Loans which are secured by first liens on real estate" means loans on the security of any instrument (whether a mortgage, deed of trust, or land contract) which makes the interest in real estate ... specific security for the payment of the obligation secured by the instrument: Provided: That the instrument is of such a nature that, in the event of default, the real estate described in the instrument could be subject to the satisfaction of the obligation with the same priority as a first mortgage ... where the real estate is located.
 
 
 37
 12 C.F.R. Sec. 590.2.
 
 
 38
 Plaintiffs argue that the regulation does no more than mimic the statutory language. However, we agree with Fidelity that this is precisely the point; the Board has simply interpreted the statutory language in accordance with its literal meaning. It would be quite extraordinary if we were to deviate from the interpretation given a statute by an administrative agency simply because the administrative interpretation did no more than implement the plain meaning of the statute.
 
 
 39
 In addition, an official interpretation of the Board makes clear that the Board did not find the scope of Sec. 501 preemption to be limited to purchase money mortgages:
 
 
 40
 [A]n agreement ... to refinance an existing first lien mortgage loan also would be considered the making of a loan for purposes of [Section 501]. Under this type of agreement, the present obliger pays off the prior first lien with proceeds from a new loan secured by a first lien on residential real property at a higher rate of interest.
 
 
 41
 Federal Home Loan Bank Board Interpretation No. 590-2, 45 Fed.Reg. 6165, 6166 (1980). This interpretation was originally issued under the predecessor to section 501(a)(1), which was in effect from December 28, 1979 to March 31, 1980. Compare Act of Dec. 28, 1979, Pub.L. No. 96-161, Sec. 105(a), 93 Stat. 1233, 1234 with DIDMCA, Pub.L. No. 96-221, Sec. 501(a)(1)(A), 94 Stat. 132, 161. Hence, Congress had this interpretation at its disposal when drafting DIDMCA and did nothing to disapprove of this plain meaning reading of Sec. 501. The Board has continued to adhere to this interpretation under the new statute. 12 C.F.R. Sec. 590.100.
 
 
 42
 Moreover, the Board's official regulations and interpretations are supported by opinions of the Board's counsel which, though not entitled to deference because of their unofficial status, are indicative of the Board's adherence to the view that the only limits on the preemptive force of Sec. 501 are those included within the text of the statute. See Opinions of Office of General Counsel, Federal Home Loan Bank Board, No. S. 5 (December 30, 1980) ("it is the view of this Office that the applicability of the federal usury preemption to a first lien mobile home loan is not affected by the use to which the loan proceeds will be put") and No. S. 6 (June 2, 1980) ("The statute and regulations require only that the loan be secured by a first lien on a residential ... home. Qualification [for Sec. 501 preemption protection] would not depend on the purpose to which loan proceeds were put."). Before this court, the Bank Board and its successor, the Office of Thrift Supervision, have taken a position wholly consistent with the foregoing regulation, interpretation, and opinions.
 
 
 43
 While we "must not rubber-stamp administrative decisions that are inconsistent with a statutory mandate or frustrate a statutory policy," United States Department of Navy v. Federal Labor Relations Authority, 840 F.2d 1131, 1134 (3d Cir.), cert. dismissed, --- U.S. ----, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988), an agency's "interpretation of a statute [it] is charged with enforcing is entitled to substantial deference ... and must be upheld even if that interpretation is not the only permissible one or even the most reasonable." Grocery Town Market, 848 F.2d at 396. The interpretation of the Board, issued roughly contemporaneously with the passage of DIDMCA and thus owed especial deference, Kean, 799 F.2d at 903, is faithful to the text of the statute and advances one of Congress' stated purposes for enacting Sec. 501--increasing the ability of financial institutions to pay market rates of interest to depositors. We are thus bound to give deference to this permissible interpretation. Chevron, 467 U.S. at 842-843, 104 S.Ct. at 2781-2782; United States v. Locke, 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985); Kean, 799 F.2d at 899.
 
 III.
 
 44
 Having found the statute's text to be plain and easily applied here, and finding no clear evidence suggesting that Congress did not intend the statutory language to be applied literally, we conclude that the plaintiffs' claims under the Pennsylvania state usury laws, and their derivative RICO and Pennsylvania Unfair Practices Law claims, are preempted by Sec. 501. Furthermore, even if Sec. 501 were arguably ambiguous, we would be constrained to render an identical decision because of the presence of a reasonable agency interpretation reading Sec. 501 as applying to the loans in this case. While we are not unaware of the consequences for the plaintiffs of our ruling, it is "Congress that chose the language that requires us to decide as we do, and Congress is free to change it." Mansell, 109 S.Ct. at 2031. We, however, are not.
 
 
 45
 The judgment of the district court will be affirmed.
 
 
 
 *
 Since the date of oral argument, Judge Seitz has taken senior status
 
 
 [1]
 Section 501(a) was previously codified as a note to 12 U.S.C. Sec. 1735f-7
 
 
 [2]
 Plaintiffs Gloria Young and Tito Manor also appealed this judgment. By stipulation, they have been dismissed as parties to this action
 
 
 [3]
 Marshall Gorson, the majority stockholder of Equitable, and Jerry Silver, President and Chief Operating Officer of Fidelity, are also defendants to this action. As the issue as to each defendant is identical, the defendants will be treated under the rubric of "Fidelity."
 
 
 [4]
 The plaintiffs also raise claims under RICO and the Pennsylvania Unfair Trade Practice and Consumer Protection Law. The district court found that these claims were derivative of plaintiffs' usury law claims. On appeal, plaintiffs conceded that this was the case; however, they attempted to withdraw this concession on rehearing before this court. We decline to allow them to do so
 
 
 [5]
 The Federal Home Loan Bank Board was recently abolished as part of Congress' overhaul of the regulation of the thrift industry. Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183. The Bank Board's functions have been transferred to the new Office of Thrift Supervision, but Board regulations and determinations are to remain in effect until modified or repealed by the new entity. FIRREA Sec. 401(h), 103 Stat. at 357; see also 54 Fed.Reg. 34637 (1989)