**In re Margaret BARBER, Debtor.**

**Margaret Barber, Plaintiff,**

**v.**

**Fairbanks Capital Corp., Alpha One Mortgage Corp., James Siesser and Advanta Mortgage Corp., Defendants.**

**Bankruptcy No. 00–10027 KJC.**
**Adversary No. 00–696.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 24, 2001.

Devon E. Sanders, Community Legal Services, Inc., Philadelphia, PA, for plaintiff.

Peter J. Leyh, Philadelphia, PA, Cynthia G. Swann, Washington, DC, Howard Gershman, Blue Bell, PA, for defendants.

## MEMORANDUM OPINION

KEVIN J. CAREY, Bankruptcy Judge.

### BACKGROUND

On October 11, 2000, plaintiff-debtor Margaret Barber filed an adversary proceeding against Fairbanks Capital Corporation, Alpha One Mortgage Corporation, James Siesser, and Advanta Mortgage Corporation, seeking relief from allegedly fraudulent home equity loans, which claims may be summarized as follows:

- *Count I:* against defendants Fairbanks Capital Corporation ("Fair-

banks") and Advanta Mortgage Corporation ("Advanta") under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* ("TILA") and the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639(a) ("HOEPA");

- *Count II:* against defendants Fairbanks and Advanta under the Pennsylvania Home Improvement Finance Act, 73 P.S. § 500–101 *et seq.* ("HIFA") and Pennsylvania's usury statute, 41 P.S. §§ 502 and 503;

- *Count III:* against all defendants under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.;*

- *Count IV:* against defendants Fairbanks and Advanta under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d)(1) ("ECOA");

- *Count V:* against defendants Alpha One and Siesser for breach of fiduciary duty; and

- *Count VI:* against defendants Fairbanks, Alpha One and Siesser under a common law fraud theory.

Before the Court is Defendant Fairbanks' Motion For Judgment On The Pleadings ("Fairbanks' Motion") requesting that Counts II, III, IV and VI of the complaint be dismissed as to Fairbanks for failure to state a claim upon which relief may be granted. For the reasons discussed below, Fairbanks' Motion will be granted as to Counts IV and VI and denied as to Counts II and III.

### LEGAL STANDARD

Fed.R.Civ.P. 12(c), made applicable to this adversary proceeding by Fed. R.Bankr.P. 7012, provides that: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

The standard to be applied under this rule has been articulated recently by my colleague, Bankruptcy Judge Diane Weiss Sigmund, as follows:

> Judgment on the pleadings will be granted only if the movant "clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan American World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir. 1988) (*quoting Society Hill Civic Association v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980)) .... In making this determination, all well-plead factual allegations in the complaint must be taken as true and all inferences must be drawn in the light most favorable to the non-moving party, *see Jablonski v. Pan American World Airways, Inc. supra.,* at 290–91, but unsupported or sweeping legal conclusions are not accepted, *Sebastian v. D & S Express, Inc.,* 61 F.Supp.2d 386, 388 (D.N.J.1999). The court looks to the facts alleged in the complaint and any attachments thereto. *Duncan v. St. Paul Fire & Marine Insurance Co., supra,* [129 F.Supp.2d 736] at 737 [(M.D.Pa.2001)]. *See also Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

*In re Roberson,* 262 B.R. 312, 318 (Bankr. E.D.Pa.2001). In light of this standard, the following facts alleged by Ms. Barber in her complaint, together with any inferences therefrom, will be taken as true for the purpose of resolving Fairbanks' Motion.

## FACTS[1]

1. Plaintiff Margaret Barber is an 86–year–old widow who owns her home at 5336 Catherine Street.

2. In early 1998, Plaintiff was solicited for home improvements by a home improvement contractor who offered to locate financing for the improvements.

3. The contractor referred Plaintiff to James Siesser, of Alpha One Mortgage Corporation, with whom he had an ongoing referral relationship.

4. Despite its name, Defendant Alpha One Mortgage Corporation is a mortgage broker, not a lender.

5. Plaintiff knows and therefore avers that she did not enter into any mortgage broker agreement with Defendants Alpha One or Siesser. Alternatively, if she did, such an agreement would be void in that she never was provided with a notice of her right to cancel required by 73 Pa.Stat. § 201–7.

6. Instead of seeking a lender to provide the home improvement loan requested, Siesser contacted Defendant Advanta's predecessor in interest, Coastal Financial ("Coastal"), with whom he had an ongoing relationship as an originator and broker.

7. Defendants Siesser and Alpha One did not request nor was Coastal willing to approve the home improvement loan requested by Plaintiff. Instead, they unilaterally prepared a home equity consolidation loan transaction for Plaintiff, one that would pay off the existing mortgage, and pay a water bill and various unsecured debts, in addition to the home improvements.

8. By requiring Plaintiff to consolidate her debts and representing that such consolidation would be beneficial, Coastal, Alpha One, and Siesser were able to charge and collect higher fees for themselves.

9. Neither Defendant Siesser nor Coastal notified Plaintiff at any time prior to the loan closing that it would not extend credit to her on the terms initially requested.

10. On or about July 15, 1998, a loan closing was held at Plaintiff's home. Plaintiff executed a Note, [and] Mortgage that obligated her for a $25,000.00 home equity loan with a 30/15 year term balloon for $22,360.63 and a 13.550% interest rate.

11. Defendants Siesser and Alpha One received $3,750.00 in broker fees from Coastal for the transaction. Of this amount, $2,500.00 was paid out of the loan proceeds; the remaining $1,250.00 was paid outside of closing by Coastal as an incentive payment to reward Defendants Seisser and Alpha One for the rate they obtained, i.e., as a reward for "upselling" their own "client."

12. Of the $25,000.00 loan amount, only $9,000 went to the home improvement contractor. Defendant Siesser and Coastal, required as a condition of getting the home improvements, that Plaintiff pay $8,994.15 in unsecured consumer debt, $1,759.08 for a consumer credit loan, and $839.00 in taxes and utilities.

13. In addition to these payoffs and the $3,750.00 in broker fees, the loan

---

[1]. The facts contained herein are taken verbatim from the background "Factual Allegations" as set forth in paragraphs 9 through 31 of the complaint.

included charges that are illegal in the case of home improvement loans, including an appraisal fee ($350.00), credit report, courier and application fees to Coastal ($423.00), flood service fees ($16.75), processing fees ($350.00), fees to a closing attorney ($420.00), and title insurance and fees ($570.00).

14. Because the $9,000.00 earmarked for home improvements was less than requested, some improvements were not done, and others were done poorly.

15. Plaintiff complained to Defendant Siesser about the quality of work, and Defendant Siesser used the opportunity to convince or mislead Plaintiff into getting additional home improvement financing.

16. Instead of seeking home improvement financing Plaintiff sought, Siesser again steered Plaintiff to a "subprime" home equity lender— the now bankrupt Sterling National Mortgage Company.

17. Sterling, Fairbanks' predecessor in interest, was another company for whom Siesser frequently originated loans, and with whom he had a close working relationship.

18. On or about January 7, 1999, less than six months after the Advanta loan, another loan closing was held at Ms. Barber's home. This time Plaintiff executed a Note, [and] Mortgage that obligated her for a $33,600.00 home equity loan with a prepayment penalty.

19. The loan, which allocated $4,206.83 in home improvement money, required Plaintiff to pay off a $437.00 to Capitol One Bank [sic] and included another $3,097.00 in fees to Defendant Seisser.

20. Furthermore, although the Sterling transaction was less [than] six months after the Coastal transaction, Defendant Siesser and Sterling required Plaintiff [to pay] another $350.00 appraisal and $395.00 closing fee to the same appraiser and closing agent, as well as full price for title insurance fees and costs, instead of the appropriate reissue rate. The loan also included other fees and costs illegal in home improvement financing.

21. Defendants took advantage of the Plaintiff in order to have her enter into a grossly one-sided, overpriced and disadvantageous loan transaction.

22. At all relevant times, Defendant Siesser and Alpha One acted as an agent for Defendant Advanta's and Fairbanks' predecessors in interest, in that they performed numerous lender functions, including taking a loan application, gathering supporting information, arranging an appraisal, and in numerous other respects, and they were paid a fee pursuant to an understanding between them and both predecessors in interest.

23. Defendants were parties to an agreement or conspiracy to omit material facts in their dealings with Plaintiff, including, but not limited to:

 • failing to clearly explain the Defendants' motives in requiring Plaintiff to borrow more than she needed or requested;

 • failing to clearly explain the advantages and disadvantages of a consolidation loan instead of simple home improvement financing or second mortgage loan; and

- failing to clearly explain the role of the broker and the amount and basis of his compensation prior to his becoming involved and performing "services."

## DISCUSSION

### I. *Pennsylvania Home Improvement Finance Act.*

■■ In Count II of her complaint, Ms. Barber alleges that both loans[2] were "home improvement installment contracts" within the meaning of the Pennsylvania Home Improvement Finance Act ("HIFA"), 73 P.S. § 500–101 *et seq.* and that the loans were structured in violation of HIFA by charging consumer fees, costs, commissions and other charges not authorized by the Act.[3] Fairbanks argues that the Second Loan falls within the "direct loan" exception to the definition of a home improvement installment contract[4] and that HIFA does not apply.

HIFA defines a "home improvement installment contract" as follows:

> **"Home improvement installment contract"** or **"contract"** means an agreement covering a home improvement installment sale, whether contained in one or more documents, together with any accompanying promissory note or other evidence of indebtedness, to be performed in this Commonwealth pursuant to which the buyer promises to pay in installments all or any part of the time sale price or prices of goods and services, or services. The meaning of the term does not include such an agree-

ment, if (i) it pertains to real property used for a commercial or business purpose; or (ii) it covers that sale of goods by a person who neither directly nor indirectly performs or arranges to perform any services in connection with the installation of or application of the goods; or (iii) it covers only an appliance designed to be freestanding and not built into and permanently affixed as an integral part of the structure such as a stove, freezer, refrigerator, air conditioner, other than one connected with a central heating system, hot water heater and the like; or (iv) it covers the sale of goods and the furnishing of services or the furnishing of services thereunder for a cash price stated therein of three hundred dollars ($300) or less; **(v) the loan is contracted for or obtained directly by the retail buyer from the lending institution, person or corporation;** or (vi) the loan is insured, or a written commitment to insure it has been issued, pursuant to national housing legislation.

73 P.S. § 500–102(10) (emphasis added).

In her complaint, Ms. Barber alleges that she contacted defendants Seisser and Alpha One about problems with the home improvements being performed as a result of the First Loan.[5] As a result of this contact, Ms. Barber alleges that defendants Seisser and Alpha One convinced Ms. Barber to obtain additional financing for home improvements and selected the lender for the financing.[6] The plain language of the direct loan exception provides expressly that, to fall within the exception,

---

**2.** The July 15, 1998 loan (described in paragraph 10 of the Facts, *supra.*) shall be referred to as the "First Loan" and the January 7, 1999 loan (described in paragraph 18 of the Facts, *supra.*) shall be referred to as the "Second Loan."

**3.** Complaint, paragraphs 45–46.

**4.** 73 P.S. § 500–102(10)(v).

**5.** Complaint, paragraph 23.

**6.** Complaint, paragraphs 23–24.

the loan be one that the "retail buyer"[7] contracts for or obtains *directly* from a lending institution. Ms. Barber made no contact directly with the lender to obtain the Second Loan; rather, defendants Seisser and Alpha One selected Sterling and, further, took various actions such as taking a loan application, gathering supporting information, and obtaining an appraisal, to arrange for Second Loan financing.[8]

At least two courts in this jurisdiction, *Gonzalez v. Old Kent Mortgage Co.*, 2000 WL 1469313 (E.D.Pa.2000) and *In re Brown*, 134 B.R. 134 (Bankr.E.D.Pa.1991), have rejected the application of the direct loan exception in cases in which the consumer relied upon the home improvement contractor to arrange for the financing of the home improvement contract. The *Gonzalez* court found that HIFA applied to a home improvement loan in which the builder, who had promised to obtain financing for the plaintiff, contacted a broker who, in turn, contacted the lender who provided the home improvement financing. *Gonzalez*, 2000 WL 1469313 at *1. The builder participated in obtaining the financing by forwarding the work order and the plaintiff's loan application to the lender. *Id.* The builder and the broker were present at the loan closing, where the

builder was issued a check directly from the lender. *Id.*

In *Brown*, the plaintiff contacted a home improvement contractor, in response to a flyer left at her house, for home repairs. *Brown*, 134 B.R. at 136–37. The contractor provided the plaintiff with a price for the requested work and informed the plaintiff that he would obtain financing. *Id.* The contractor then approached the lender and all arrangements for the financing of the plaintiff's home improvements were made between the contractor and the lender. *Id.* The contractor even drove the plaintiff to and from the loan closing. *Id.* The plaintiff testified that she had never "dealt with nor heard of" the lender prior to that transaction. *Id.*

The common thread in these two cases is that the contractor, while not directly providing the financing for the home improvements, arranged for financing of the home improvements on behalf of the consumer and the consumer made no independent effort to obtain the home improvement loan. This financing technique, referred to as "dragging the body," was recognized by Pennsylvania courts analyzing similar consumer protection statutes.[9] In his opinion supporting reversal, which was issued as part of a split decision by the Pennsylvania Superior Court in a case

---

7. Section 500–102(15) of HIFA defines "retail buyer" as "a person who buys goods and services, or services from a contractor pursuant to a home improvement installment contract." Since the alleged purpose of the Second Loan was to obtain additional funds for home improvements [See Complaint, paragraphs 23 and 27], Ms. Barber falls within the definition of a retail buyer for purposes of the Second Loan.

8. Complaint, paragraph 30.

9. *See Anderson v. Automobile Fund*, 258 Pa.Super. 1, 20–21, 391 A.2d 642, 652 (1978) (Opinion in Support of Reversal by Judge Spaeth) (finding that the loan and sale of an

automobile should be collapsed into a single transaction to prevent the car dealer and lender from avoiding the regulatory scheme of the Motor Vehicle Sales Finance Act, 69 P.S. § 601 *et seq.*, by a superficial restructuring of the automobile financing and sale transactions); *Iron and Glass Bank v. Franz*, 9 Pa.D. & C.3d 419, 1978 WL 357 at *2 (C.C.P. Allegheny County 1978) (finding that the protections for consumers who purchase goods and services on credit, established by the legislature in the Goods and Services Installment Sales Act, 69 P.S. § 1101 *et seq.*, should extend to all credit transactions in which the seller supplies, provides or arranges for financing).

involving automobile financing, Judge Edmond B. Spaeth, Jr. described the "dragging the body" technique as follows:

This term describes the technique whereby an automobile dealer who is unwilling or unable to extend credit to a potential customer persuades the customer to obtain a loan from a specified lender, usually a consumer discount company, with which the dealer has established a prior understanding. The dealer plays an active role in arranging the financing between the discount company and the potential customer (he "drags the customer's body" to the discount company). As compensation, the dealer receives an economic benefit at least to the extent that the customer has been provided with the funds necessary to buy the used car.

*Anderson,* 391 A.2d at 649 (Opinion In Support Of Reversal by Judge Spaeth).

In analyzing whether the financing fell within the direct loan exception, the *Brown* court employed the "dragging the body" theory and wrote:

The key components of a HIFA contract are that it involve home improvements and that these improvements are to be financed by the contractor, as opposed to by a direct loan obtained independently by the consumer. The instant transaction clearly involves a home improvement. The only difficult issue is whether the contractor's ubiquitous presence in the transaction eliminates the exception for direct loans contained in 73 P.S. § 500–102(10)(v). We hold that it does, since the Debtor made no effort whatsoever to obtain or contract for a loan directly from Courtesy or any other lender.

*Brown,* 134 B.R. at 141. The *Gonzalez* court agreed with the reasoning of *Brown* and similarly held that the loan in that case also did not fall within the direct loan exception of HIFA. *Gonzalez,* 2000 WL 1469313 at *2. Thus, the direct loan exception to "home improvement installment contracts" under HIFA has not been applied in cases in which the consumer relies upon the contractor to obtain financing and makes no independent effort to locate financing on her own.

The present case involves two separate loans. The facts alleged with respect to the First Loan are similar to the facts in *Gonzalez.* Ms. Barber relied on the home improvement contractor to obtain financing; the contractor contacted Seisser and Alpha One who, in turn, contacted the lender (Coastal, Advanta's predecessor) to obtain financing. The facts do not indicate that Ms. Barber took any action on her own to obtain the financing.

The facts alleged with respect to the Second Loan, however, differ. In the complaint, Ms. Barber alleges that the monies set aside for home improvements in the First Loan were less than requested and, therefore, improvements were not done or were done poorly.[10] The complaint alleges that "Plaintiff complained to Defendant Seisser about the quality of the work, and Defendant Siesser used the opportunity to convince or misled Plaintiff into getting additional home improvement financing."[11] There are no allegations in the complaint that the *contractor* was involved in arranging the Second Loan. Ms. Barber alleges that at least part of the Second Loan was allocated for "home improvement money"[12] and argues that this brings the Second Loan within the definition of a Home Improvement Installment Contract. Fur-

10. Complaint, paragraph 22.

11. Complaint, paragraph 23.

12. Complaint, paragraph 27.

ther, Ms. Barber argues that the direct loan exception does not apply because defendants Seisser and Alpha One—not Ms. Barber—ultimately selected the lender for the transaction.

To decide whether the direct loan exception applies to the Second Loan, I must determine whether the Second Loan was obtained "directly" by Ms. Barber when she contacted defendants Seisser and Alpha One about the problems with the home improvements. I find that the facts alleged, which I must accept as true, do not indicate that Ms. Barber sought financing for home improvements directly from the lender. Instead, defendants Seisser and Alpha One arranged for the Second Loan's financing, so that Ms. Barber would have funds for additional home improvements.

Fairbanks argues that the participation of the broker is insufficient to deny the benefit of the direct loan exception to it, and that the presence of the contractor himself is necessary to keep the Second Loan transaction outside of the direct loan exception. The above-cited cases, which rely upon the "dragging the body" theory, focus on the actions of the contractor or seller who "drags the body" to the lender.[13] Although the complaint does not allege that the contractor directly arranged for the Second Loan, the allegations indicate a significant nexus between the First Loan and the Second Loan, including involvement of the contractor, which makes it difficult to separate them. First, Ms. Barber alleges that the contractor offered

to locate financing for home improvements.[14] These home improvements provide the reason for both the first and second financing transactions that are described in the complaint because the Second Loan took place after Ms. Barber complained about problems with respect to the completion of the home improvements. The second financing was undertaken to correct those problems.[15] Second, the complaint alleges that the contractor referred Ms. Barber to defendants Seisser and Alpha One.[16] Because defendants Seisser and Alpha One allegedly are the entities who ultimately selected and arranged for the home improvement financing for both transactions, I find that the "dragging the body" technique applies to this set of facts, since the contractor dragged the consumer to the entity who ultimately arranged for financing both transactions. No facts show that Ms. Barber herself took any independent action to select the lenders.

This result is also consistent with the purpose of HIFA, which was described in a law review article written shortly after its enactment as follows:

> In response to the need for balancing the various equities of a consumer who has a legitimate complaint, the honest contractor who is dealing with an unreasonable customer, and the financing agency who has acquired the paper for value, in good faith and without knowledge of the complaint, the Pennsylvania

---

**13.** *See Brown,* 134 B.R. at 141 (noting the "ubiquitous presence" of the contractor in obtaining the financing); *Anderson,* 391 A.2d at 649 (noting the car dealer's active role in arranging financing as a key component of the "dragging the body" technique); *Iron and Glass Bank,* 1978 WL 357 at *2 ("[B]ecause the legislature, through the Goods and Services Installment Sales Act, provides protections to consumers who purchase goods and services on credit, such protections should extend to all credit transactions in which the seller supplies, provides or arranges for the extension of credit in order to effect the purposes of the legislation.").

**14.** Complaint, paragraph 10.

**15.** *See* Complaint, paragraph 22 and 23.

**16.** Complaint, paragraph 11.

legislature passed the Home Improvement Finance Act.

Edward Gerald Donnelly, Jr., *Legislative Solution To a Judicial Dilemma: The Pennsylvania Home Improvement Finance Act*, 10 Vill.L.Rev. 309, 315 (Winter 1965). The alleged facts reflect that defendants Seisser and Alpha One knew of Ms. Barber's dissatisfaction with the performance of the home improvements and it follows that Sterling knew or should have known of problems, since it was "flipping" a loan that was closed fewer than six months earlier. The alleged facts indicate that the Second Loan was of the type of transaction which the legislature expected would be subject to HIFA, thereby providing protection to consumers from contractors who do not perform as promised and lenders who attempt to insulate unfairly their financing from the home improvement transaction.

■■ Fairbanks also argues that, even if HIFA applies to the Second Loan, Ms. Barber cannot recover any damages under the Pennsylvania usury laws [17] because those laws have been preempted by federal law, specifically Section 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), 12 U.S.C. § 1735f–7a(a)(1). Fairbanks cites *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907 (3d Cir.1990) in support of its argument. This same argument was considered and dismissed by the *Gonzalez* court in relation to a claim for damages based upon violations of HIFA.

*Gonzalez*, 2000 WL 1469313, at *2–3. The *Gonzalez* court reviewed the legislative history of DIDMCA and the Third Circuit's decision in *Smith* and found that Congress intended DIDMCA to preempt only those state usury laws that imposed ceilings on the interest rates charged. *Id.* In this matter, as in *Gonzalez*, the damages alleged by Ms. Barber do not arise from a high interest rate *per se*, but from the inclusion of non-interest charges prohibited by HIFA in the loan transactions in issue. I agree with the conclusion of *Gonzalez* and find that Ms. Barber's HIFA claims are not preempted.

For the foregoing reasons, Fairbanks' Motion will be denied with respect to Count II.

## II. *Pennsylvania Unfair Trade Practices and Consumer Protection Law.*

■ In Count III of the complaint, Ms. Barber alleges that all defendants are liable to her for damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*[18] Fairbanks argues that Count III should be dismissed against it because (1) Fairbanks was a subsequent holder of the Second Loan and, therefore, could not have engaged in any conduct alleged by Ms. Barber in Count III as unfair and deceptive practices within the meaning of the statute; and (2) the original lender (Sterling) did not engage in fraudulent or deceptive conduct by failing to structure the loan

17. 41 P.S. §§ 502, which provides in part:
A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges: Provided,

That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment.

18. This statute is frequently referred to as "UDAP" since it regulates "unfair and deceptive acts and practices." *See In re Murray*, 239 B.R. 728, 729 (Bankr.E.D.Pa.1999).

under HIFA since the Second Loan is a direct loan.

In her complaint, Ms. Barber alleges the Second Loan was subject to the Home Owner Equity Protection Act ("HOEPA") amendments to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*[19] Taking this allegation as true, as I must for purposes of considering Fairbanks' Motion, Fairbanks becomes subject to assignee liability under 15 U.S.C. § 1641(d). That section provides that an assignee of a HOEPA loan:

> shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this title, the itemization of the amount financed, and other disclosure of disbursement that the mortgage was a mortgage referred to in [HOEPA].

15 U.S.C. § 1641(d). The term "creditor" is defined at 15 U.S.C. § 1602(f) as follows:

> The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by

agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the fact of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

At least one court has held that Section 1641(d) "eliminates HDC [holder in due course] defenses as to all claims asserted by the consumer *under TILA or other laws,* unless the assignee proves, by a preponderance of the evidence, that it could not determine that the loan was a HOEPA loan." *Murray,* 239 B.R. at 733 (emphasis added). The foregoing statute subjects Fairbanks, as assignee of the Second Loan, to causes of action that Ms. Barber can assert against Sterling, the original "creditor" of the loan, including UDAP claims.[20] Because I conclude in Section I that the Second Loan is not exempt from HIFA as a "direct loan," and because the acts underlying Ms. Barber's UDAP claims are not limited to HIFA violations, Fairbanks' second argument for dismissal of Count III also fails. Accordingly, Ms. Barber is entitled to present evidence in support of the claims in Count III.

19. In paragraph 37 of the complaint, Ms. Barber alleges that the both loans were "high rate mortgages within the meaning of 15 U.S.C. § 1602(aa)(1)(B), in that the total points and fees the Defendant's predecessors in interest charged Plaintiff in addition to interest exceeded 8 percent of the amount financed." Further, the alleged facts show that the Second Loan was for a total of $33,600 [Complaint, paragraph 26] and that fees on the loan exceeded $3,097.00 [Complaint, paragraphs 27 and 28]. Accepting these allegations as true, as I must, the fees for the Second Loan would exceed 8 percent of the total amount financed, thus supporting Ms. Barber's conclusion that the Second Loan is subject to HOEPA.

20. It should be noted that, although an assignee's holder in due course defenses are eliminated by 15 U.S.C. § 1641(d), subsections 1641(d)(2) and (3) limit the total amount of an assignee's liability. *Murray,* 239 B.R. at 734. Further, if Ms. Barber is successful on her claim for rescission of the loans under Count I of her complaint, she may be prevented from also pursuing a claim under UDAP for actual damages. *See In re Steinbrecher,* 110 B.R. 155, 160 (Bankr.E.D.Pa.1990).

## III. *Equal Credit Opportunity Act.*

 In Count IV of her complaint, Ms. Barber alleges that Fairbanks' predecessor in interest (Sterling) violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"). Specifically, Ms. Barber alleges that Sterling violated 15 U.S.C. § 1691(d)(1), which provides:

(1) Within thirty days ... after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

The term "creditor" as used in ECOA is defined in 15 U.S.C. § 1691a(e) as follows:

(e) The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; *or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.*

(Emphasis added). ECOA's implementation regulation (Regulation B) further defines "creditor" in 12 CFR 202.2(1) by adding the following:

A person is not a creditor regarding any violation of the act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation, before becoming involved in the credit transaction.

Although 15 U.S.C. § 1641(d) subjects assignees of HOEPA loans to any claims that could be asserted against the original creditor (as defined by HOEPA), ECOA specifically eliminates an assignee's liability for ECOA violations unless the assignee participated in the violation or knew or had reasonable notice of the act that constituted the violation. *See FGB Realty Advisors, Inc. v. Riedlinger,* 671 So.2d 560, 565 (La.Ct.App.1996).

 In situations when a general statute, such as the HOEPA assignee liability provision of § 1641(d), and a specific statute, such as ECOA's definition of creditor of § 1691a(e), appear to be in conflict, courts have relied upon the general rule that "a more specific statute covering a particular subject is controlling over a provision covering the same subject in more general terms.... Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *In re Sullivan,* 254 B.R. 661, 666 (Bankr.N.J.2000). *See also Coady v. Vaughn,* 251 F.3d 480, 484 (3d Cir.2001) ("The rationale for this canon is that a general provision should not be applied when doing so would undermine limitations created by a more specific provision."); *Selected Risks Insurance Co. v. Kobelinski,* 421 F.Supp. 431, 434 (E.D.Pa. 1976). Applying this rule of statutory construction, I find that the general assignee liability provision of HOEPA will not trump ECOA's specific limitation on assignee liability. Since Ms. Barber did not (and, it appears, cannot) allege that Fairbanks had any participation or knowledge in Sterling's decision to extend credit to Ms. Barber, Count IV of Ms. Barber's complaint will be dismissed as to Fairbanks.

## IV. *Fraud.*

 Fairbanks' raises various arguments for dismissal of Count VI of the complaint (based upon common law fraud) against it, including: (1) that Fairbanks was not involved in the negotiation, procurement or closing of either loan and, therefore, cannot be liable for any alleged misrepresentations or omissions of its predecessor; and (2) that the Ms. Barber fails to allege the necessary facts to support a claim of fraud.

Count VI of the complaint contains two paragraphs alleging fraudulent conduct. Paragraph 59 alleges that "all defendants and/or their predecessors in interest made material misrepresentations or omitted material information to consummate the home equity loan and home improvement contract ..." and then lists various alleged misrepresentations without specifics, such as which party made the misrepresentations or which loan transaction was involved. Fed.R. of Civ.P. 9(b), made applicable by Fed.R.Bankr.P. 7019(b), provides that: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." One decision put it this way:

> The purpose of Rule 9(b) is to "place defendants on notice of the precise misconduct with which they are charged and to guard against spurious charges of immoral and fraudulent behavior."

*Smith v. Berg*, 2000 WL 365949, at *4 (E.D.Pa.2000) citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984). The *Smith* court further wrote that fraud allegations need to contain the "who, what, when, and where", *id.*, of the fraudulent conduct to meet the standard set in Rule 9(b).

Ms. Barber's complaint does not contain specifics about the allegedly fraudulent conduct and, subsequently, Fairbanks does not have sufficient notice of the precise conduct that it must defend.[21] Accordingly, Fairbanks' Motion will be granted with respect to Count VI.

For the reasons stated above, Fairbanks' Motion will be granted with respect to Counts IV and VI, and will be denied with respect to Counts II and III.

---

21. As discussed in Part II above, 15 U.S.C. § 1641(d) may subject Fairbanks, as assignee of the original "creditor" of the Second Loan, to "all claims and defenses" which Ms. Barber could assert Sterling. However, before such a claim can be asserted against Fairbanks pursuant to § 1641(d), it must be a valid claim against Sterling. In this case, the complaint does not allege sufficient facts to specify the fraudulent conduct Sterling allegedly committed.